**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **MICHAEL JAMES MOTTO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:06-0163** |
| | ) | |
| **CORRECTIONAL MEDICAL** | ) | |
| **SERVICES, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are Defendants' Motions for Summary Judgment (Document Nos. 85 and 88.) and Plaintiff's Motion for Summary Judgment (Document No. 149.). The Court notified Plaintiff pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to the Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by Defendants in moving for summary judgment. (Document No.111.) Plaintiff has filed Responses to Defendants' Motions and Affidavits in Support. (Document Nos. 105, 107, 113, 115, and 150.) Having thoroughly examined the record in this case, the undersigned respectfully recommends that the District Court deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motions for Summary Judgment.

**PROCEDURAL HISTORY**

On March 2, 2006, Plaintiff, an inmate in confinement at Mount Olive Correctional Complex [MOCC], in Mt. Olive, West Virginia, and acting *pro se*, filed a Complaint and an Application to

Proceed Without Prepayment of Fees and Affidavit.[1] (Document Nos. 1 and 2.) Plaintiff names as Defendants the following individuals and entities: (1) Correctional Medical Services, St. Louis, MO [CMS]; (2) Correctional Medical Services, MOCC [CMS]; (3) Mary Westfall, H.S.A.- CMS at MOCC; (4) Dr. Larry Holmes, Physician - CMS at MOCC; (6) West Virginia Division of Corrections; (7) James Rubenstein; and (8) State of West Virginia. In his Complaint, Plaintiff alleges as follows:

> Medical treatment has been substandard, it has been more than 2 yrs of a delay for a surgery I need since refer[r]ed to Dr. Zaslau at University Hospital in Morgantown W. Va. from Dr. Edgerton at Montgomery General in Montgomery, W.V. When surgery was attempted in August 2005 by Dr. Zaslau the delay by CMS at Mt. Olive caused it not to be able to be performed, so instead of a 45 minute to a 1 hour procedure, I must endure a 4 to 6 hour operation. This operation is for restrictions in my urinary tract. The lack of it has cause[d] over 3 yrs of trouble urinating, pain in bladder, abdomen and severe kidney pain, numerous kidney and urinary tract infections, 5 or 6 infections just since August. Was supposed to return to Morgantown within 2 - 3 weeks of August 11, 2005. Delay by CMS has been 5 ½ months thus far. This is malpractice, medical indifference, medical neglect, etc.

(Document No. 1, pp. 4 - 5.) He indicates that he exhausted his claims administratively. (Id., p. 3.) Plaintiff seeks an injunctive order directing the Defendants to arrange for him to undergo the surgical procedure by Dr. Zaslau and to provide proper medical treatment. (Id., p. 5.) Plaintiff seeks damages in the amount of $30,000,000 from CMS; $100,000 from Mary Westfall, Dr. Holmes, and Dr. Williamson (Id., pp. 5 - 6.); $1,000,000 from West Virginia Division of Corrections; $100,000 from James Rubenstein, and $1,000,000 from State of West Virginia. (Id., p. 6.)

On November 16, 2006, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees, and Summonses were issued. (Document Nos. 6 and 7.) On December 1, 2006,

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

Defendants James Rubenstein, Division of Corrections, and State of West Virginia [State Defendants] filed their Waiver of Reply and Alternative Motion to Dismiss and Memorandum in Support. (Document Nos. 8 and 9.) In seeking dismissal, the State Defendants asserted that (1) the State of West Virginia and Division of Corrections are not "persons" subject to suit under 42 U.S.C. § 1983, and that the State of West Virginia and the Division of Corrections are protected against suit under the Eleventh Amendment of the United States Constitution (Document No. 9, pp. 2 - 3.); (2) the State Defendants are entitled to qualified immunity (Id., pp. 3 - 4.); (3) Plaintiff has failed to state a claim for deliberate indifference to his medical conditions, and therefore, Plaintiff cannot meet the objective and subjective components of the applicable Eighth Amendment analysis (Id., pp. 4 - 6.); and (4) the State Defendants cannot be liable as supervisors on the basis of the doctrine of respondeat superior. (Id., pp. 6 - 7.)

On December 18, 2006, Defendants Mary Westfall, Dr. Williamson, CMS, and Dr. Holmes [Medical Defendants] filed their Motion to Dismiss and Memorandum in Support. (Document Nos. 17 and 18.) In their Memorandum in Support, the Medical Defendants contended that Plaintiff's Complaint must be dismissed because (1) Plaintiff's service of process was insufficient (Document No. 18, pp. 1- 3.); (2) Plaintiff failed to state a claim against Defendants in that he has neither articulated the elements of a medical malpractice claim in West Virginia nor stated a claim of deliberate indifference to a serious medical need in violation of the Eighth Amendment to the United States Constitution (Id., pp. 3 - 6.); and (3) the Court lacks subject matter jurisdiction over Plaintiff's claim as it "is most easily construed as one for medical malpractice under state law." (Id., pp. 6 - 7.)

On January 18, 2007, Plaintiff filed a Motion to Amend his Complaint, seeking permission to name Thomas McBride, Warden of MOCC, as a Defendant in his Complaint. (Document No. 22.)

Plaintiff asserted that Warden McBride, while acting under color of state law, violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution. (Id., p. 1.) In support of this Motion, Plaintiff stated as follows:

> It has become clear to the Plaintiff that Mr. McBride's actions in the events leading up to the above style action being filed he should have been included as a defendant with the original filing. His actions were a direct cause of the claims made by the Plaintiff. The Plaintiff asserts that the Warden should be held accountable for his actions. This should be clear in the Plaintiff's Objections and Response to the Defendants Commissioner James Rubenstein, the Division of Corrections and the State of West Virginia's Waiver of Reply and Alternative Motion to Dismiss.

(Id., p. 2.) Plaintiff further filed on January 18, 2007, his Objections and Response to the State Defendants' Waiver of Reply and Alternative Motion to Dismiss. (Document No. 23.) Plaintiff asserted that he was suing State Defendants in their professional and personal capacities, and, therefore, they are not entitled to qualified immunity. (Id., p. 2.) He claimed that State Defendants violated "their responsibilities as supervisors in their respective positions." (Id., pp. 2 - 3.) Plaintiff explained that Commissioner Rubenstein is "responsible for the treatment and care of the prisoners within [the State] institutions" and Warden McBride "is responsible for the operation of the institution under his control." (Id., p. 3.) Plaintiff asserted that State Defendants were informed that surgery was ordered by an outside physician and they failed to investigate or take action. (Id., p. 5.) Plaintiff stated that he was seeking $50,000 compensatory and $50,000 punitive damages each from Commissioner Rubenstein and Warden McBride. (Id., p. 6.)

Plaintiff filed on January 24, 2007, his Objections and Response to Defendants Mary Westfall, Larry Williamson, M.D., Correctional Medical Services, Inc., and Donald Holmes, M.D. Motion to Dismiss." (Document No. 25.) Regarding the Defendants' claim of insufficient process and service of process, Plaintiff asserted that he provided the Court with properly completed service

forms for the United States Marshal Service. (Id., p. 2.) Specifically, he stated that once he "mailed these service forms in good faith to the Court he feels the responsibility of the service is out of his hands." (Id.) Concerning Defendant Holmes, Plaintiff claimed that the fact that Defendant Holmes is no longer associated with CMS does not provide a basis to dismiss his claims against him. (Id.) Plaintiff then set forth a summary of the facts to clarify his claims against Defendants Westfall, Holmes, and Williamson. (Id., pp. 6 - 10.) Plaintiff further stated that CMS has "an unofficial policy of delaying cases as long as possible, most likely to attempt to save money and boost profits." (Id., p. 11.)

On August 27, 2007, the undersigned filed his Proposed Findings and Recommendation recommending that (1) the State Defendants' Motion to Dismiss (Document No. 8.) should be granted in part and denied in part, (2) the Medical Defendants' Motion to Dismiss (Document No. 17.) should be denied, and (3) Plaintiff's Motion to Amend his Complaint to add Warden McBride as a defendant (Document No. 22.) should be denied. (Document No. 27.) Specifically, the undersigned concluded as follows: (1) the State of West Virginia and the Division of Corrections are immune from suit under the Eleventh Amendment (Id., pp. 10 - 11.); (2) Plaintiff improperly raised his claims against Defendant Rubenstein under the doctrine of *respondeat superior* and failed to established supervisory liability (Id., pp. 11 - 12.); (3) It would be inappropriate to dismiss Plaintiff's claims against Defendants Westfall, Williamson, and Holmes, for insufficient service of process (Id., pp. 12 - 15.); (4) Plaintiff sufficiently alleged an Eighth Amendment claim of deliberate indifference (Id., pp. 15 - 20.); (5) Plaintiff's medical malpractice claim should be dismissed because he failed to file a notice of claim as required by the West Virginia Medical Professional Liability Act (Id., pp. 20 - 25.); and (6) Plaintiff's Motion to include Warden McBride as a Defendant should

5

be denied because Plaintiff seeks to raise improper claims under the doctrine of *respondeat superior* and has failed to establish supervisory liability (Id., pp. 25 - 27.). Plaintiff and Medical Defendants timely filed objections to the undersigned's Proposed Findings and Recommendation. (Document Nos. 28 and 29.) By Memorandum Opinion and Order entered on September 27, 2007 (Document No. 32.), the District Court overruled Medical Defendants' objections and sustained in part and overruled in part Plaintiff's objections. The District Court concluded as follows: (1) Plaintiff's allegations were sufficient to state a Section 1983 claim against CMS (Id., pp. 6 - 7.); (2) Plaintiff's allegations were sufficient to state a Section 1983 claim against Defendants Rubenstein and McBride (Id., pp. 7 -8.); (3) "With regard to Mr. McBride, as Defendants have not filed responsive pleadings within the meaning of Fed. R. Civ. P. 15(a), Plaintiff has the right to amend his Complaint once as a matter of course" (Id., p. 8.); and (4) Plaintiff's medical negligence claim is dismissed based on his failure to satisfy the mandatory screening certificate of merit requirement (Id., pp. 9 - 11.). Accordingly, the District Court (1) granted in part and denied in part State Defendants' Motion to Dismiss (Document No. 8.); (2) granted in part and denied in part Medical Defendants' Motion to Dismiss (Document No. 17); and (3) denied as moot Plaintiff's Motion to Amend to add Thomas McBride as a defendant, and referred the matter back to the undersigned for further proceedings. (Id., p. 11.)

On October 3, 2007, Defendant McBride filed his Answer to Plaintiff's Complaint. (Document No. 34.) Additionally, State Defendants filed a Cross Claim against Medical Defendants on October 3, 2007. (Document No. 35.) State Defendants allege that CMS contracted with State Defendants to provide medical services to MOCC inmates and had a duty "to indemnify, defendant and hold harmless these defendants and cross-claimants for all claims arising out of the performance

of the said contract." (Id., p. 2.) State Defendants deny they are guilty of any deliberate indifference and state that any damages sustained by Plaintiff "are the sole proximate result of the acts or omissions" of CMS and its employees. (Id., p. 3.) In the alternative, State Defendants claim if they are found to be liable to Plaintiff, such liability "would be secondary and passive as compared to the primary and active deliberate indifference or other act or omission" by CMS. (Id., p. 3.) On October 9, 2007, Medical Defendants filed their Answer to Plaintiff's Complaint and the Cross Claim. (Document Nos. 39 and 40.)

On October 4, 2007, the undersigned entered a Scheduling Order setting forth the time frame for the completion of discovery. (Document No. 38.) Following discovery, Defendants filed their Motions for Summary Judgment and Memoranda in Support on March 4, 2008. (Document Nos. 85, 86, 88, and 89.) State Defendants argue that they are entitled to summary judgment because (1) Plaintiff failed to prove that either Defendant was aware that Plaintiff had a serious medical need to which the Defendant was deliberately indifferent (Document No. 86, pp. 9 - 15.); (2) Neither Defendant is a "person" for purposes of the applications of Section 1983 because Plaintiff cannot prove either Defendant "acted in any personal manner with respect to his claims"(Id., pp. 15 -16.); and (3) Plaintiff "cannot establish that either Defendant had actual or constructive knowledge that a subordinate was putting Mr. Motto in risk of constitutional injury, that their responses were deliberately indifferent, or that there was a causal link between their actions and Mr. Motto's alleged injuries" (Id., pp. 16 -18.). State Defendants further allege that "medical defendants had full knowledge of Mr. Motto's complaints years in advance of Messrs. Rubenstein and McBride." (Id., pp. 16 - 17.) Specifically, Defendant McBride asserts that he did not learn of Plaintiff's ailment until August 10, 2005, and that Defendant Rubenstein did not learn of it until August 25, 2005. (Id., p. 17.)

7

Medical Defendants argue that they are entitled to summary judgment because (1) there was no two year delay (Document No. 89, p. 7.); (2) there is no evidence that any delay in scheduling an appointment with Dr. Zaslau caused him to change the procedure performed (Id., p. 8.); (3) Defendants Williamson, Holmes, and Westfall were not deliberately indifferent to Plaintiff's medical condition (Id., pp. 8 - 11.); and (4) Plaintiff cannot prevail against CMS because he cannot prevail against any individual defendant (Id., p. 11.).

On April 7, 2008, Plaintiff filed a "General Response to Defense's Motions for Summary Judgment and Memorandum of Law" (Document No. 104.), "Plaintiff's Objections to the Medical Defendants, Dr. Williamson, Dr. Holmes, Mary Westfall, and CMS' Motion for Summary Judgment and Memorandum of Law" (Document No. 105.), and "Plaintiff's Objections to James Rubenstein and Thomas McBride's Motion for Summary Judgment and Memorandum of Law" (Document No. 107.). In his General Response, Plaintiff argues that discovery has not been completed and "summary judgment is not appropriate until the non-moving party has had sufficient opportunity for discovery." (Document No. 104, p. 2.) Plaintiff contends that medical records provided by Medical Defendants were not complete. (Id.) Further, Plaintiff contends that he does not have his medical records from Dr. Edgerton or Dr. Zaslau. (Id., p. 3.)

In Plaintiff's Objections to Medical Defendants' Motion, Plaintiff contends that there is sufficient evidence of deliberate indifference by Defendants. (Document No. 105.) Plaintiff alleges that Dr. Edgerton diagnosed him with the stricture on August 19, 2003, and informed him that he would need an additional surgery. (Id., pp. 1 - 2.) Plaintiff, however, did not receive the surgery until March 1, 2006. (Id.) Plaintiff states that the "overall time frame of the delay in the medical care of this Plaintiff surely constitutes a 'deliberate indifference' to the Plaintiff's 'serious medical needs.'"

(Id., p. 2.) Plaintiff argues that the stricture in his urinary tract was a serious medical condition because it caused daily problems emptying his bladder, urinary tract infections, pain and swelling of his right kidney, and blood in his urine. (Id.) During the fifteen months that Defendant Williamson treated Plaintiff, Plaintiff argues that Defendant Williamson failed to timely schedule referrals and failed to provide sufficient pain medication. (Id., p.2 - 4.) Plaintiff states that "from the 1st of November, 2004, until that consultation request by Dr. Holmes on the 24th of May, 2005, Dr. Holmes did nothing but ignore this Plaintiff." (Id., p. 4.) Plaintiff alleges that the delay caused him to have a significant stricture, which required an urethroplasty to be performed instead of an alternative procedure. (Id., p. 5.) Plaintiff alleges that Defendant Westfall is responsible for inmates' health care and she was aware of his need for surgery in June, 2005. (Id., p. 7.)

In Plaintiff's Objections to Defendants Rubenstein and McBride's Motion, Plaintiff claims both Defendants were aware of the delay in Plaintiff's medical care. (Document No. 107.) Plaintiff states that "Plaintiff, by means of letters, grievances and personal conversations with the Warden McBride made the defendant fully aware of his medical condition and the delay by the staff of CMS of the first and second surgery." (Id., p. 2.) Plaintiff argues that Defendant Rubenstein failed to properly investigate his claim that his surgery was being delayed because he relied solely upon the response of Nurse Hobbs. (Id., p. 4.) Plaintiff asserts that it is clear that "he fully and completely informed the Defendants of the serious medical need, that the Defendants chose a wholly inadequate investigation, and did nothing, therefore were deliberately indifferent." (Id., p. 6.) Plaintiff contends that State Defendants delay caused him unnecessary pain and suffering. (Id., p. 7.)

On April 14, 2008, Medical Defendants filed their Reply Brief. (Document No. 109.) Medical Defendants argue that Plaintiff improperly calculates the period of delay by beginning with

the date that Dr. Edgerton diagnosed Plaintiff's stricture (August, 2003), instead of the date of referral (July 27, 2004). (Id., p. 1.) Medical Defendants state that Plaintiff's Complaint alleged that the delay began when Dr. Edgerton referred him to Dr. Zaslau for treatment on July 27, 2004. (Id.) Medical Defendants contend that Dr. Edgerton directed Plaintiff's medical care until the date of referral. (Id.) Medical Defendants continue to argue that there is insufficient evidence that they acted with deliberate indifference in providing Plaintiff's medical care. (Id., pp. 2 - 7.) Finally, CMS argues that it is not responsible for the actions of its employees because there is no vicarious liability, including *respondeat superior*, under federal civil rights law." (Id., p. 7.)

State Defendants filed their Reply on April 16, 2008. (Document No. 110.) State Defendants argue that they were not notified pursuant to MOCC's grievance policy about Plaintiff's urinary tract stricture until August 10, 2005, and Plaintiff was seen by Dr. Zaslau on August 12, 2005. (Id., p. 1.) State Defendants assert that they properly investigated Plaintiff's complaints and Plaintiff was scheduled for surgery. (Id.) State Defendants contend that Plaintiff failed to notify them when the surgery was moved to a later date. (Id., p. 2) Even assuming that Plaintiff did have conversations with Defendant McBride, Defendant argues that "mere conversations are insufficient to begin the grievance procedure." (Id.)

On April 17, 2008, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff, advising him of his right to file a response to the Defendants' Motions for Summary Judgment. (Document No. 111.) On May 21, 2008, Plaintiff filed further "Objections to Motions for Summary Judgment and Reply to Medical Defendants Reply Brief." (Document No. 113.) Plaintiff continues to argue that he has been unable to complete discovery in this case. (Id., p. 1.) Plaintiff indicates that he is unable to obtain Dr. Edgerton's medical records from the

10

Montgomery General Hospital. (Id.) Plaintiff also continues to argues that the lapse in time exhibits that the Medical Defendant were deliberately indifference. (Id., pp. 2 - 7.)

On September 16, 2008, the undersigned conducted a hearing to determine whether the parties obtained, disclosed and shared all documents and information germane to their claims and defenses. (Document No. 124.) During the above hearing, defense counsel agreed to provide Plaintiff with certain documents: (1) Jason Wandling, counsel for State Defendants, agreed to provide Plaintiff with a copy of the ACA Manual; and (2) John McChesney, counsel for Medical Defendants, agreed to provide Plaintiff with a copy of CMS's policies and procedures concerning the referral of inmates to "outside" physicians. (Id.) Additionally, the undersigned granted Plaintiff's oral Motion for Subpoenas for the office charts and notes of Dr. Edgerton and Dr. Zaslau. (Id.) On December 16, 2008, Mr. McChesney filed a Motion for Protective Order seeking "to have the policies and procedures of Correctional Medical Services, Inc., that they have been ordered to produce, labeled 'Confidential Information' and their dissemination and use limited as specified in the memorandum and proposed order." (Document Nos. 134 and 135.) On December 17, 2008, the Court ordered Medical Defendants to submit a copy of the pertinent documents for in camera review. (Document No. 136.) By Order entered on January 9, 2009, the undersigned denied Medical Defendants' Motion for Protective Order. (Document No. 137.) On January 16, 2009, Medical Defendants timely filed objections. (Document No. 138.) By Memorandum Opinion and Order entered on February 9, 2009, District Judge Johnston affirmed the undersigned's Order denying Medical Defendants' Motion for Protective Order. (Document No. 141.) On February 17, 2009, Medical Defendants filed a Certificate of Mailing indicating that "CMS's Policies and Procedures Manuals were mailed [to Plaintiff], postage prepaid, on this 17th day of February, 2009." (Document

11

No. 142.) By Order entered on March 3, 2009, the Court stayed the case in order to allow Plaintiff adequate time to file a response, if any, addressing the merits of Defendants' Motions for Summary Judgment. (Document No. 143.)

On December 1, 2009, Plaintiff filed his Motion for Summary Judgment (Document No. 149) and "Memorandum in Support of Plaintiff's Motion for Summary Judgment and Further Objections to Defendants' Motions for Summary Judgment (Document No. 150.) Plaintiff argues that he is entitled to summary judgment because he has shown that defendants "were deliberately indifferent to the Plaintiff's serious medical needs." (Document No. 149, p. 1.) Plaintiff contends that "[t]ogether the Medical Defendants caused unnecessary and deliberate delays in the Plaintiff's medical care of between 16 months and 9 days, to 18 months and 5 days. This includes the Plaintiff having to endure walking around the Mt. Olive Correctional Complex for nearly 7 months with a suprapublic catheter that was to be removed by Dr. Zaslou within 2 to 3 weeks of the August 2005 surgery." (Id.) Plaintiff alleges that he "was left with inadequate pain medication for the entire time from the day he was diagnosed by Dr. Edgerton and the time of the second surgery by Dr. Zaslou in March of 2006."[2] In support of his Motion, Plaintiff claims that Defendants are liable because they failed to follow the American Correctional Association [ACA] and National Commission on Correctional Health Care [NCCHC] guidelines. (Document No. 150, pp. 1- 7.)

First, Plaintiff alleges that all defendants violated the following ACA guidelines:

[O]n page 96, Section E: Health Care, it states in 1A: Offenders have unimpeded access to a continuum of health care services so that their health care needs,

---

[2] The undersigned will not address Plaintiff's claim concerning inadequate pain medication because the claim was not asserted in his Complaint. The Court, however, notes that Plaintiff's medical record reveals that Plaintiff was provided with pain medication throughout his treatment at Mt. Olive.

including prevention and health education, are met in a timely and efficient manner.

[O]n Page 120 of the ACA manual, under Performance Standard: Offender Treatment it states under 3A: Offenders are treated humanely, fairly, and in accordance with established policy and all applicable laws.

(Id., pp. 1 and 3.) Plaintiff claims that "[a]ll defendants in this case were no where near ensuring that Plaintiff's health care needs were met in a timely manner." (Id., pp. 1 - 2.) Plaintiff argues that he has "documented unnecessary delays in his health care of 16 months and 8 days to 18 months and 5 days by the medical defendants and the non-medical defendants did nothing to correct the actions of the medical defendants." (Id., p. 2.) Plaintiff states "[w]ith the unnecessary delays outlined by the Plaintiff in this case, there is no way that this Plaintiff was treated humanly or fairly." (Id., p. 3.)

Second, Plaintiff argues that Defendant Westfall violated the following ACA guideline:

[O]n page 114 of the ACA manual under Health Authority, 4-4380, which is a mandatory standard, it states in the second paragraph: The health authority may be a physician, health services administrator, or health agency. When the health authority is other than a physician, final clinical judgments rest with a single, designated, responsible physician. The health authority is authorized and responsible for making decisions about the deployment of health resources and the day to day operations of the health services program.

(Id., p. 2.) Plaintiff claims that Defendant Westfall "did not need to make a clinical decision, Dr. Edgerton, the doctors at Mt. Olive and Dr. Zaslou were all in agreement that this Plaintiff was in need of the surgery and it was obvious to anyone who knew about the suprapublic catheter that the Plaintiff had for an unnecessary time of almost 7 months that the Plaintiff needed the second surgery." (Id.) Thus, Plaintiff alleges that Defendant Westfall failed "to ensure that appointments were made in a timely manner." (Id.)

Third, Plaintiff claims that Defendants Westfall, Rubenstein, and McBride violated the following ACA guideline:

> [O]n page 115, under Provision of Treatment, 4-4381, which is also a mandatory standard, it states in the Comment: The Provision of health care is a joint effort of administrators and health care providers and can be achieved only through mutual trust and cooperation. The health authority arranges for the availability of health care services: the responsible clinician determines what services are needed; the official responsible for the facility provides the administrative support for making the services accessible to offenders.

(Id.) Plaintiff states that "Mary Westfall surely did not make sure that appointments were made and/or kept" and "[s]he did not even address the problem in the grievances." (Id.) Plaintiff claims that "Mr. McBride was contacted several times, and Mr. Rubenstein at least once, and they took the famous Mt. Olive 'hands off' approach to medical care." (Id.) Plaintiff argues that the "clinical decision was already made, the medical defendants were not getting the Plaintiff to Morgantown for the surgery and Mr. Rubenstein and Mr. McBride were doing nothing to ensure that the medical staff were doing what they needed to do to treat the Plaintiff in any kind of timely manner." (Id., p. 3.)

Fourth, Plaintiff asserts that all defendants violated the following NCCHC standards:

P-A-01 Standard. Inmates have access to care to meet their serious medical, dental, and mental health needs.

P-A-03 Standard. Clinical decisions and actions regarding health care provided to inmates to meet their serious medical needs are the sole responsibility of qualified health care professionals.

P-E-12 Standard. The facility insures that inmates receive diagnostic and other health services ordered by clinicians. Diagnostic and treatment results are used by clinicians to modify treatment plans as appropriate.

(Id., pp. 3 - 6.) Plaintiff states that the above standards were violated because defendants exposed him to 16 months of delay. Plaintiff contends that the suprapubic catheter was left in for seven months, which resulted in "several infections." (Id.)

Finally, Plaintiff argues that Medical Defendants violated the following NCCHC standard: "P-A-02 Standard: The facility has a designated health authority responsible for health care

14

services." (<u>Id.</u>, p. 4.) Plaintiff contends that Medical Defendants "failed to make sure the Plaintiff

had access to quality, accessible, and timely health care services." (<u>Id.</u>, p. 5.) Accordingly, Plaintiff

contends that the record supports a finding that Defendants acted with deliberate indifference to his

medical condition because Defendants violated the above ACA and NCCHC standards.

On December 9, 2009, Medical Defendants filed their Response to Plaintiff's Motion for

Summary Judgment. (Document No. 151.) Medical Defendants first argue that the failure to comply

with ACA and NCCHC standards does not establish that Plaintiff is entitled to judgment. (<u>Id.</u>, pp.

1 - 2.) Specifically, Medical Defendants state that "there is no authority for the proposition that

isolated infractions of such guidelines prove deliberate indifference to a serious medical need." (<u>Id.</u>)

Next, Medical Defendants reiterate that the record contradicts Plaintiff's factual assertion that there

were unnecessary delays in providing Plaintiff with medical treatment. (<u>Id.</u>, pp. 2 - 8.) Medical

Defendants argue that there is no evidence that they "took any deliberate action to delay the patient's

urethroplasty." (<u>Id.</u>, p. 4.)

On December 14, 2009, State Defendants filed their Response to Plaintiff's Motion for

Summary Judgment. (Document No. 152.) State Defendants argue that the guidelines promulgated

by the ACA and NCCHC "do not establish constitutional minima." (<u>Id.</u>, p. 1.) State Defendants

further claim that even assuming the standards were black letter law, Plaintiff's claims still fail

because he received "significant and near-constant medical care." (<u>Id.</u>) State Defendants continue

to claim that "they had no indication that Mr. Motto believed he was not receiving adequate care."

(<u>Id.</u>, p. 3.) Specifically, Defendant McBride states that he "had no opportunity to do anything with

regard to Mr. Motto's treatment because Mr. Motto was seen in medical, and underwent a medical

procedure, after filing the G-2 and before Mr. McBride's response." (<u>Id.</u>) Defendant Rubenstein

asserts that he "facilitated treatment by ordering Ms. Westfall to respond to Mr. Motto's inquiry." (Id.) Finally, State Defendants argue that prison officials must leave medical decisions to the physicians and they "are entitled to rely on professional medical opinions." (Id., pp. 2 - 3.)

## FACTUAL HISTORY

Based upon a review of the record it appears that Dr. Peter Edgerton, an outside physician, began treating Plaintiff in June, 2002. Dr. Edgerton performed an urethrotomy on Plaintiff in November, 2002. When Defendant Williamson began treating Plaintiff in July, 2003, Plaintiff had a history of urinary strictures and had previously been treated by Dr. Edgerton. On July 23, 2003, Defendant Williamson ordered that Plaintiff be referred to Dr. Edgerton for an urology evaluation. (Document No. 88, Medical Record, pp. 17, 755.) On August 19, 2003, Dr. Edgerton evaluated Plaintiff and recommended that a CT scan be conducted. (Id., pp. 34, 262, 757.) Defendant Williamson requested the CT scan on same date. (Id., p. 18.) The CT scan was performed on September 16, 2003. (Id., pp. 19, 35, 316.) On December 20, 2003, Defendant Williamson requested that Plaintiff be referred to Dr. Edgerton for a recommendation on treatment options "based on his exams and CT Scan." (Id., pp. 19, 355, 759) On February 5, 2004, Defendant Williamson followed-up on the consult with Dr. Edgerton. (Id., p. 356.) On February 24, 2004, Dr. Edgerton evaluated Plaintiff and requested a second CT scan, which Defendant Williamson ordered on the same date. (Id., pp. 20, 35, 761.) The CT scan was conducted on March 18, 2004. (Id., pp. 21, 317 - 18.) On March 22, 2004, Defendant Williamson requested that "Dr. Edgerton review CT scan and make recommendation." (Id., pp. 21, 253, 356, 762.) On April 26, 2004, Defendant Williamson requested a cystoscopy. (Id., pp. 22, 357.) The cystoscopy revealed that Plaintiff had a recurrent urinary stricture. (Id., p. 23.) On May 10, 2004, Defendant Williamson requested a "retrograde urethrorgram

16

to determine [the] length of stricture." (Id., pp. 23 - 24, 765.) The urethrorgram was performed on June 1, 2004, and revealed that Plaintiff had a one centimeter stricture. (Id., pp. 319, 358.) On June 11, 2004, Defendant Williamson requested that Plaintiff be "referred back to Dr. Edgerton for possible dilatation." (Id., pp. 25, 766.) On July 9, 2004, Defendant Williamson requested a "follow up with Dr. Edgerton for visual urethrotomy or skin graft for urethral stricture." (Id., pp. 26, 36, 360, 767.) On July 10, 2004, Plaintiff sent a letter addressed the CMS Administer complaining about the delay in his medical treatment. (Document No. 55, p. 6.) Dr. Edgerton discussed with Plaintiff his treatment options on July 22, 2004, and recommended that Plaintiff be referred to Dr. Zaslau at the University of Health Associates in Morgantown for a consult to determined if a urethotomy or graft should be performed. (Document No. 88, Medical Record, pp. 27 - 28, 37.) On July 27, 2004, Defendant Williamson noted that he had received Dr. Edgerton's recommendation and ordered that Plaintiff be referred to Dr. Zaslau for a determination of treatment options. (Id., pp. 360, 769.) Defendant Williamson discussed with Plaintiff his surgical options on August 2, 2004. (Id.) On September 9, 2004, Defendant Williamson noted that Plaintiff inquired concerning his appointment with Dr. Zaslau and "April is currently arranging [the] MOTV appointment." (Id.) Defendant Williamson stopped treating inmates at MOCC in September, 2004.

On October 4, 2004, S. Myers noted that Plaintiff inquired concerning his appointment with Dr. Zaslau. (Id., p. 361) On October 31, 2004, Plaintiff wrote the CMS Administer inquiring whether there was a problem in scheduling "the surgery Dr. Edgerton referred me to Morgantown for over a year ago."[3] (Document No. 55, p. 7.) On November 9, 2004, Dr. Planch requested that Plaintiff be

---

[3]  The undersigned notes that on July 22, 2004, Dr. Edgerton recommended that Plaintiff be referred to Dr. Zaslau for a consult concerning treatment options. Thus, the recommendation was made only three months prior to Plaintiff's October 31, 2004, letter.

referred to Dr. Zaslau for consult on available surgical options. (Document No. 88, Medical Record, pp. 27 - 28.) On December 9, 2004, an appointment with Dr. Zaslau was scheduled for March 21, 2005, which was the first available appointment. (Id., pp. 368, 772.) On February 24, 2005, Plaintiff wrote Mark Fordice with CMS inquiring "if CMS intends on following Dr. Edgerton's recommendation for the surgery he referred me to Morgantown for."(Document No. 55, p. 8.) On March 14, 2005, Plaintiff refused to go to his March 21, 2005, appointment and signed a refusal form. (Document No. 88, Medical Record, p. 134; Document No. 88-3, Affidavit of Donald Holmes, p. 2.) On March 15, 2005, S. Myers noted that Plaintiff inquired concerning his appointment with Dr. Zaslau. (Document No. 88, Medical Record, p. 365.) Defendant Holmes rescheduled the appointment with Dr. Zaslau for May 2, 2005. (Id., pp. 44, 304, 366.) Defendant Westfall became the Health Services Administrator for CMS at the Mount Olive Correctional Complex in May, 2005. (Document No. 88-1, Affidavit of Mary Westfall, p. 1.) On May 2, 2005, Plaintiff was examined by Dr. Zaslau, who requested additional procedures. (Document No. 88, Medical Record, pp. 44, 304, 366.) On May 20, 2005, Defendant Holmes requested a cystoscope - retrograde urethrography and ordered that Plaintiff be referred to Dr. Zaslau for a follow-up appointment. (Id., pp. 6, 366, 776 - 77.) Subsequently, Defendant Holmes received approval for the additional procedures that were requested by Dr. Zaslau on May 2, 2005. (Document No. 88-3, Affidavit of Donald Holmes, p. 3.) On June 26, 2005, Plaintiff filed a G-1 addressed to Defendant Westfall complaining of blood in his urine and stating that he is "hoping that the next surgery in Morgantown is soon and will correct these problems." (Document No. 55, p. 9 - 11.) On June 27, 2005, Plaintiff presented complaining that his "kidneys really hurt." (Document No. 88, Medical Record, p. 369.) Defendant Westfall responded to Plaintiff's G-1 on June 29, 2005. (Document No. 55, p. 9 - 11.) On July 17, 2005,

18

Plaintiff again wrote Defendant Westfall inquiring about the scheduling of his surgery with Dr. Zaslau. (Id., p. 12.) On August 3, 2005, Plaintiff filed an additional G-1 addressed to Defendant Westfall complaining that his surgery had not occurred and his pain medication had been discontinued. (Id., pp. 13 - 15.) On August 10, 2005, Plaintiff filed his G-2. (Id., pp. 16 - 17.) On August 12, 2005, Dr. Zaslau performed the following procedures: a retrograde urethrogram, urethroscopy, cystogram, and open vesicostomy. (Document No. 88, Medical Record, pp. 823 - 825; Document No. 88-3, Affidavit of Donald Holmes, p. 3.) Based on the procedures, Dr. Zaslau determined that Plaintiff needed an urethroplasty. (Id., p. 4.) On August 16, 2005, Defendant Holmes requested an urethroplasty and scheduled the appointment for September 22, 2005. (Document No. 88, Medical Record, pp. 7, 371, 786, 794.) Also on August 16, 2005, Defendant McBride denied Plaintiff's grievance. (Document No. 55, p. 18.) On August 25, 2005, Plaintiff sent a letter to Defendant Rubenstein complaining that his surgery was being improperly delayed. (Id., pp. 19 - 20.) Defendant Rubenstein sent a memo to Defendant McBride requesting that Defendant Westfall respond to Plaintiff's G-1. (Document No. 85-2, p. 21.) On September 21, 2005, Dr. Planch noted that Plaintiff was "awaiting urethroplasty consult" scheduled with Dr. Zaslau. (Document No. 88, Medical Record, p. 373.) The appointment scheduled for September 22, 2005, did not occur for unknown reasons.[4] On September 28, 2005, Keith Hobbs, CMS Director of Nursing at MOCC, responded to Plaintiff's G-1. (Document No. 55, p. 21.) Defendant Rubenstein denied Plaintiff's appeal on October 11, 2005. (Id., p. 22.)

On November 15, 2005, Plaintiff presented complaining of a urinary tract infection and inquiring about his appointment with Dr. Zaslau. (Document No. 88, Medical Record, p. 375.) In

---

[4] It appears that Plaintiff was in the infirmary from September 16 - 19, 2005, due to severe back pain. (Document No. 88, Medical Record, pp. 427 - 30.)

response, Dr. Planch "obtained old record and consult results from Dr. Zaslau WVU." (Id.) On November 27, 2005, Plaintiff sent a letter to Defendant McBride complaining that he had not been taken for surgery and was experiencing urine tract infections. (Document No. 55, p. 23.) On December 28, 2005, the medical department scheduled Plaintiff an appointment with Dr. Zaslau for January 30, 2006. (Document No. 88, Medical Record, p. 376.) On January 30, 2006, Dr. Zaslau examined Plaintiff and scheduled an urethroplasty for March 1, 2006. (Id., pp. 45, 305.) Dr. Zaslau performed an urethroplasty on Plaintiff on March 1, 2006. (Id., pp. 45, 287 - 90.) On March 3, 2006, Dr. Planck requested that Plaintiff be scheduled for his follow-up appointment with Dr. Zaslau. (Id., pp. 10, 793.) Following Plaintiff's surgery, he was placed in the infirmary for observation from March 11 - 21, 2006. (Id., pp. 431 - 442.) Dr. Planck examined Plaintiff on March 15, 2006. (Id., p. 378.) On March 20, 2006, Plaintiff was examined by Dr. Zaslau and his foley catheter was removed. (Id., pp. 46, 379.) It was noted that Plaintiff was able to urinate without difficulty. (Id.) On March 21, 2006, Dr. Planck requested an appointment be scheduled with Dr. Zaslau for the removal of the suprapubic catheter. (Id., pp. 11.) On March 28, 2006, Dr. Planck noted that there was "slight drainage around the suprapubic catheter." (Id., p. 380.) Dr. Planck examined Plaintiff on April 4, 2006, and noted that the suprapubic catheter was irritating his bladder." (Id.) On April 17, 2006, Dr. Zaslau examined Plaintiff and removed the suprapubic catheter. (Id., pp. 47, 796.) On April 18, 2006, Dr. Planck noted that both catheters had been removed and Plaintiff was "voiding well." (Id., p. 12.) Dr. Planck further requested that Plaintiff be scheduled a follow-up appointment with Dr. Zaslau in three months. (Id.) Dr. Zaslau saw Plaintiff for a follow-up appointment on July 17, 2006. (Id., p. 48.) On December 13, 2006, Plaintiff was scheduled for a follow-up appointment with Dr. Zaslau. (Id., p. 387.) Dr. Zaslau again saw Plaintiff for a follow-up appointment on January

8, 2007. (Id., pp. 51, 303.) On January 30, 2007, the medical department noted that Plaintiff denied any painful urination, trouble initiating stream, pressure, or feeling of fullness. (Id., p. 388.)

## THE STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution

and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.S.C. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct.

2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding deliberate indifference to inmate's medical needs.); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978), cert.

23

denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) First, therefore, Plaintiff in this case must allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, supra, 511 U.S. at 837, 114 S.Ct. at 1979. It is well established that a private physician under contract with a State to provide medical services to inmates acts under color of State law when treating them and may therefore be held liable under Section 1983. See West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2257, 101 L.Ed.2d 40 (1988); Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994) ("If a physician treating a prisoner – whether by contract or referral – misuses his power by demonstrating deliberate indifference to the prisoner's serious medical needs, the prisoner suffers a deprivation under color of state law.") Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

**A.      Motions for Summary Judgment regarding Medical Defendants (Document Nos. 88 and 149):**

Medical Defendants argue that they are entitled to summary judgment for the following reasons: (1) There was no two year delay (Document No. 89, p. 7.); (2) There is no evidence that any delay in scheduling an appointment with Dr. Zaslau caused him to change the procedure performed (Id., p. 8.); (3) Defendants Williamson, Holmes, and Westfall were not deliberately indifferent to Plaintiff's medical condition (Id., pp. 8 - 11.); and (4) CMS "does not qualify as a 'person' for purposes of 42 U.S.C. § 1983" and its policies and procedures are constitutional. (Id., p. 11.)

Plaintiff contends that he is entitled to summary judgment because the record clearly shows that Medical Defendants unnecessarily delayed medical treatment for Plaintiff's serious medical condition. (Document No. 149.) Plaintiff claims that "[t]ogether the Medical Defendants caused unnecessary and deliberate delays in the Plaintiff's medical care of between 16 months and 9 days, to 18 months and 5 days. This includes that Plaintiff had to endure walking around the Mt. Olive Correctional Complex for nearly 7 months with a suprapubic catheter that was to be removed by Dr. Zaslou within 2 to 3 weeks of the August 2005 surgery."[5] (Id.) In support of his Motion, Plaintiff states that Medical Defendants' deliberate indifference is established by their failure to comply with standards set forth by the ACA and NCCHC. (Document No. 150.)

---

[5]   There is no evidence supporting Plaintiff's claim that the suprapubic catheter was to be removed in two weeks. After conducting the procedures on August 12, 2005, Dr. Zaslau noted that "[d]ue to the inability to pass the Foley catheter through the uretrha, it was determined that the patient would benefit from a suprapublic tube." (Document No. 88, Medical Records, p. 825.) In the "Disposition" section of Dr. Zaslau's report, he states as follows: "The patient will be discharged back to the facility today. He was given Bactrim for antibiotic prophylaxis as well as Percocet for pain control. He will be notified of the date and time for his upcoming surgery. The patient will need an open urethroplasty for his stricture." (*Id.*)

The Court will consider the motions for summary judgment concerning each Medical Defendant in turn. First, the undersigned will consider the allegations against Defendant Williamson. Plaintiff contends that Defendant Williamson acted with deliberate indifference by delaying for a total of 8 ½ months Plaintiff's referral for urological care to an "outside" physician. (Document No. 105, p. 4.) Assuming that Plaintiff's medical condition was serious enough to give rise to an Eighth Amendment claim, there is no evidence that Defendant Williamson knew of and disregarded an excessive risk to Plaintiff's health by delaying or failing to provide urological treatment. Based upon a review of the record, it appears that Defendant Williamson treated Plaintiff from July, 2003, to September, 2004. During the one year and two months that Defendant Williamson treated Plaintiff, he referred Plaintiff to Dr. Edgerton six times for evaluation, ordered two CT scans and a cystoscopy, and ordered that an appointment be scheduled with Dr. Zaslau pursuant to Dr. Edgerton's recommendation. In his affidavit, Defendant Williamson states that "[t]hrough my efforts, these outside providers determined that the patient did not have bladder cancer, but did have a recurrent stricture that required attention from a provider outside the local area of the prison." (Document No. 88-3, p. 4.) Defendant Williamson states as follows concerning the scheduling of Plaintiff's appointment with Dr. Zaslau: "Due to circumstances beyond my control, perhaps a lack of available appointments or difficulty in arranging for transporting this high security inmate, this appointment did not occur prior to my leaving Mt. Olive in September 2004. In the approximately six weeks between the request for the appointment and my departure from the prison, I could not have done anything to further expedite the appointment." (Id., p. 5.) The undersigned notes that there is no indication that Dr. Edgerton advised that the appointment with Dr. Zaslau should be expedited or occur within a specific time period. Based upon the foregoing, there is no indication that

Defendant Williamson knew of and disregarded an excessive risk to Plaintiff's health or safety. Accordingly, Plaintiff's Motion for Summary Judgment should be denied as to Defendant Williamson and Defendant Williamson's Motion for Summary Judgment should be granted.

Next, the Court will consider the allegations against Defendant Holmes. Plaintiff contends that Defendant Holmes acted with deliberate indifference by failing to refer him to Dr. Zaslau for treatment. Assuming that Plaintiff's medical condition was serious enough to give rise to an Eighth Amendment claim, there is no evidence that Defendant Holmes knew of and disregarded an excessive risk to Plaintiff's health by delaying or failing to provide urological treatment. It appears that Defendant Holmes treated Plaintiff from November 1, 2004, until September, 2005. Approximately one month after Defendant Holmes began treating Plaintiff, an appointment with Dr. Zaslau was scheduled for March 21, 2005. The record indicates this was the first available appointment. In his affidavit, Defendant Holmes states that Plaintiff signed a refusal form and refused to attend his March 21, 2005, appointment. (Document No. 88, Medical Record, p. 134; Document No. 88-3, Affidavit of Donald Holmes, p. 2.) Defendant Holmes rescheduled the appointment with Dr. Zaslau for May 2, 2005. On May 2, 2005, Dr. Zaslau recommended additional testing, which Defendant Holmes requested. On August 12, 2005, Plaintiff saw Dr. Zaslau for a follow-up appointment and the following procedures were performed: a retrograde urethrogram, urethroscopy, cystogram, and open vesicostomy. Based on the above procedures, Dr. Zaslau determined an urethroplasty was necessary. Four days later, Defendant Holmes requested an urethroplasty and scheduled the procedure for September 22, 2005. During the one year period that Defendant Holmes treated Plaintiff, it appears that Defendant Holmes requested additional testing and arranged for four appointments with Dr. Zaslau. Defendant Holmes states that Dr. Zaslau "did

27

not indicate that the passage of time since the patient's last appointment with Dr. Edgerton altered his treatment in any way." (Document No. 88-4, Affidavit of Donald Holmes, p. 3.) Defendant Holmes further asserts that Dr. Zaslau "did not indicate that the patient faced an emergent situation." (Id.) Based on the foregoing, there is no indication that Defendant Holmes knew of and disregarded an excessive risk to Plaintiff's health or safety. The undersigned, therefore, finds that Plaintiff's Motion for Summary Judgment should be denied as Defendant Holmes and Defendant Holmes' Motion for Summary Judgment should be granted.

Third, the Court will consider the allegations against Defendant Westfall. Plaintiff claims that Defendant Westfall was deliberately indifferent to his need to be referred to Dr. Zaslau. Specifically, Plaintiff contends that he filed a G1 addressed to Ms. Westfall as early as June, 2005, informing Defendant Westfall of the delay in scheduling an appointment with Dr. Zaslau. The undersigned notes that Defendant Westfall did not become Health Services Administrator until May, 2005. It appears that Plaintiff was first examined by Dr. Zaslau on May 2, 2005, and Dr. Zaslau requested additional procedures. Subsequently, additional procedures were requested by Defendant Holmes and a follow-up appointment was scheduled with Dr. Zaslau for August 12, 2005. On June 26, 2005, July 12, 2005, and August 3, 2005, Plaintiff filed grievances with Defendant Westfall concerning the scheduling of his appointment with Dr. Zaslau. At the time Plaintiff filed his grievances, it appears that Plaintiff had an appointment scheduled with Dr. Zaslau but was not informed of the appointment due to security reasons. On August 12, 2005, Dr. Zaslau performed a retrograde urethrogram, urethroscopy, cystogram, and open vesicostomy. Dr. Zaslau failed to note any complications during the forty-six minute procedure on August 12, 2005. Based upon the results of the above procedures, Dr. Zaslau recommended that Plaintiff needed an urethroplasty. There is

28

no indication that the urethroplasty would have been unnecessary had the above procedures been performed sooner. On August 16, 2005, Defendant Holmes requested and scheduled an urethroplasty for September 22, 2005. It appears that Plaintiff's September 22, 2005, appointment was cancelled because Plaintiff was suffering from severe back pain and was not in a condition to undergo surgery. Although the medical department did not attempt to reschedule Plaintiff's appointment with Dr. Zaslau until December 28, 2005, the delay was not an act of deliberate indifference on the part of Defendant Westfall. A review of the record reveals that Plaintiff failed to notify Defendant Westfall of any delay in rescheduling his appointment after it was cancelled on September 22, 2005. The three month delay in rescheduling Plaintiff's appointment appears to be the result of possible negligence on the part of the medical department. On January 30, 2006, Plaintiff was transported to his appointment with Dr. Zaslau, who scheduled Plaintiff's urethroplasty procedure for March 1, 2006.[6] The record reveals that Plaintiff's urethroplasty was preformed successfully and without complications.[7] Based on the foregoing, there is no indication that Defendant Westfall knew of and disregarded an excessive risk to Plaintiff's health or safety. The undersigned, therefore, finds that Plaintiff's Motion for Summary Judgment should be denied as to Defendant Westfall and Defendant Westfall's motion for summary judgment should be granted because there is no evidence that Defendant Westfall violated Plaintiff's Eighth Amendment rights by acting with deliberate indifference to Plaintiff's medical needs.

Finally, the undersigned will consider Plaintiff's claim against CMS that the "overall time

---

[6]   It seems logical that Dr. Zaslau would have scheduled Plaintiff for an emergency urethroplasty or an earlier appointment if he believed the delay had jeopardized Plaintiff's health.

[7]   Dr. Zaslau noted that Plaintiff's "[s]urgery was performed on March 1, 2006, without complication." (Document No. 85-2, p. 32.)

frame of the delay in the medical care of this Plaintiff surely constitutes a 'deliberate indifference' to the Plaintiff's 'serious medical needs.'" Plaintiff states that CMS acted with deliberate indifference because CMS and its staff failed to adhere to the ACA and NCCHC standards. CMS claims it "does not qualify as a 'person' for purposes of 42 U.S.C. § 1983" and its policies and procedures are constitutional. A corporation acting under color of State law can be held liable under Section 1983 only for unconstitutional policies and practices. Monell v. Dep't of Soc. Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). They cannot be held liable under the doctrine of *respondeat superior* for the individual actions of their employees. Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999); see also Johnson v. Hamilton, 452 F.3d 967, 973 (8th Cir. 2006).

The undersigned finds that there was not a two year delay in arranging for Plaintiff's urethroplasty. The record reveals that Dr. Edgerton, an outside physician, recommended that Plaintiff be referred to Dr. Zaslau in July, 2004. Defendant Williamson was unable to arrange for an appointment with Dr. Zaslau prior to Defendant Williamson leaving Mt. Olive. In November, 2004, Defendant Holmes scheduled Plaintiff an appointment with Dr. Zaslau for March, 2005, which was the earliest available appointment. The record reveals that Plaintiff refused to attend the March, 2005, appointment scheduled with Dr. Zaslau. The medical department rescheduled the appointment for May 2, 2005. On May 2, 2005, Dr. Zaslau examined Plaintiff for the first time and ordered additional procedures. On May 20, 2005, Defendant Holmes requested approval for the additional procedures and ordered that Plaintiff be referred back to Dr. Zaslau. On August 12, 2005, Dr. Zaslau performed the additional procedures on Plaintiff and determined that an urethroplasty was necessary. On August 16, 2005, Defendant Holmes requested approval for the urethroplasty and scheduled the

procedure for September 22, 2005. Plaintiff was unable to undergo the urethroplasty scheduled for September 22, 2005, because he was suffering from severe back pain. On December 28, 2005, the medical department scheduled a follow-up appointment with Dr. Zaslau for January 30, 2006. Dr. Zaslau examined Plaintiff on January 30, 2006, and scheduled Plaintiff for an urethroplasty on March 1, 2006. As scheduled, Dr. Zaslau performed Plaintiff's urethroplasty on March 1, 2006. Thus, an urethroplasty was not deemed necessary to treat Plaintiff's condition until August 12, 2005. Although the urethroplasty did not occur for approximately seven months, the medical department arranged for three appointments with Dr. Zaslau during this period of time (September 22, 2005, January 30, 2006, and March 1, 2006). Any delay in rescheduling Plaintiff's appointment with Dr. Zaslau appears to be the result of mere negligence, rather than deliberate indifference, as Plaintiff continued to receive treatment by Dr. Planck during this period of time. Furthermore, there is no evidence indicating that any delay in scheduling Plaintiff's appointments with Dr. Zaslau was the result of unconstitutional policies or procedures established by CMS. Plaintiff alleges that CMS and its staff violated several standards set forth by the ACA and NCCH. The standards provided by the ACA and NCCHC, however, do not establish the constitutional minima. The United States Supreme Court has stated that "while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." Rhodes, 452 U.S. at 348, 101 S.Ct. at 2400(quoting Bell v. Wolfish, 441 U.S. 520, 543-44, 99 S.Ct. 1861, 1876, 60 L.Ed.2d 447 (1979)); also see Alexander S. By and Through Bowers v. Boyd, 876 F.Supp. 773, 779 (D.S.C. 1995)(finding that "[a]lthough ACA standards might represent desirable goals, it is well established that they do not represent the standards minimally acceptable under the Constitution.") Therefore, Plaintiff's

argument that Medical Defendants clearly violated his constitutional rights by failing to comply with the ACA and NCCHC standards is without merit. Based on the forgoing, the undersigned finds that Plaintiff's Motion for Summary Judgment should be denied as to CMS and CMS's Motion for Summary Judgment should be granted.

### B. Motions for Summary Judgment regarding State Defendants (Document Nos. 85 and 149):

Plaintiff alleges that State Defendants violated his constitutional rights by failing to investigate his claim that CMS was delaying his surgery. (Document Nos. 149 and 150.) Plaintiff contends that State Defendants' failure to investigate, and require CMS to provide treatment, resulted in Plaintiff suffering prolonged and unnecessary pain. (Document No. 150.) Finally, Plaintiff states that deliberate indifference is established based upon State Defendants' failure to comply with ACA and NCCHC standards.[8] (Id.) State Defendants contend that they are entitled to summary judgment because Plaintiff's claims against them are improperly raised under the doctrine of *respondeat superior*. (Document Nos. 85 and 86.)

On August 3, 2005, Plaintiff filed a G-1 addressed to Defendant Westfall complaining that his surgery had not occurred and that his pain medication for his back had been discontinued. (Document No. 55, pp. 13 - 15.) Defendant Westfall failed to respond to Plaintiff's G-1. (Id.) On August 10, 2005, Plaintiff filed his G-2 stating that Defendant Westfall had not answered his G-1. (Id., pp. 16 - 17.) In his G-2, Plaintiff complained of back pain and the lack of pain medication. (Id.) On August 16, 2005, Defendant McBride denied Plaintiff's grievance stating as follows:

---

[8] As stated above, this argument is without merit as the standards provided by the ACA and NCCHC do not establish the constitutional minima.

Mr. Motto, in regard to your 10 August 2005 G-2 grievance concerning a medical issue, I offer the following:

On 03 August 2005, you submitted a G-1 grievance to Health Services Administrator Mary Westfall, complaining that you were not receiving appropriate medications, in your opinion. The G-1 was received in the Medical department on 04 August 2005, but was not answered. However, you were called to the Medical department on 08 August 2005, and it was explained to you why your medications had been changed. You were prescribed another medication on that date.

In your G-2 to my office, you claim that although you were prescribed another medication for pain on 08 August 2005, it was not sufficient. Please be advised that medical matters involving clinical judgments are the sole province of the responsible physician. While I have an obligation under state law to provide medical care at this facility, as non-medical staff, I have no role in authorization of medical care.

If you have questions or concerns relating to your health care, you must discuss them with the physician. Your grievance request that I intervene in matters relating to your health care is denied.

(Id., p. 18.) On August 25, 2005, Plaintiff sent a letter to Defendant Rubenstein complaining of back pain and that his surgery was being improperly delayed. (Id., pp. 19 - 20.) On September 21, 2005, Defendant Rubenstein sent a memorandum to Defendant McBride directing that Defendant Westfall respond to Plaintiff's G-1. (Document No. 85-2, p. 21.) Specifically, Defendant Rubenstein stated as follows:

This inmate complains that he is not receiving adequate medical care. He states that he has suffered with the following ailments for approximately two years; kidney and bladder restrictions, nerve damage/headaches stemming from his right optical nerve and a back injury that has not been followed up on. He requests these conditions be treated and an explanation as to why his pain medication was stopped and why his treatment for these conditions has not been followed up on.

Please be advised that Warden McBride is directed to provide CMS Administrator Mary Westfall with copies of this inmate's G-1, G-2 and response from MOCC along with any other documents she may require to respond to this inmate's medical grievance. The Commissioner directs that this inmate's grievance be responded to forthwith and will expect Ms. Westfall's response within the next five business days.

(Id.) On September 28, 2005, Keith Hobbs, CMS Director of Nursing at MOCC, responded to

Plaintiff's G-1 as follows:

> I apologize for your grievance not being answered by medical. Mary Westfall was out-of-town that week and we have to assume that it was missed due to that. I have reviewed your chart and have the following answers to your concerns:
>
> 1)  The reason for your Aspirin and Indocin being discontinued on August 1, 2005 was related to your surgical procedure that you had performed in Morgantown [on August 12, 2005].
>
> 2)  Dr. Ramesh saw you on 05/12/05 when you had a right optical nerve block performed. The summary sheet sent by Dr. Ramesh did not list a Rx for Fiorcet nor did it list a follow up.
>
> 3)  Since your original grievance you have seen Dr. Plank regarding your back pain. What we will do is refer you to Dr. Holmes ASAP for evaluation of your lower back pain and your headaches.
>
> Once again I apologize for your grievance not being answered by medical. If you have any further questions or concerns, please contact the medical dept. Thank you.

(Document No. 55, p. 21.) On October 11, 2005, Defendant Rubenstein denied Plaintiff's appeal.

(Id., p. 22.) Specifically, Defendant Rubenstein stated as follows:

> Please be advised that on October 5, 2005, this office received CMS Administrator Mary Westfall's response to your medical treatment. Considering the Information this office has reviewed concerning your medical based grievances, this office is comfortable that you are receiving adequate medical treatment. Therefore, your request for administrative relief is denied.

(Id.) On November 27, 2005, Plaintiff sent a letter to Defendant McBride complaining that he had

not been taken for surgery and was experiencing urine tract infections. (Id., p. 23.)

Liability under the doctrine of *respondeat superior* is generally inapplicable to actions

arising under 42 U.S.C. § 1983. See Monell v. Department of Social Services of the City of NY, 436

U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a

supervisory official if "conduct directly causing the deprivation was done to effectuate an official

34

policy or custom for which [the official] could be liable." <u>Fisher v. Washington Metro. Area Transit Auth.</u>, 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by* <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." <u>Slakan v. Porter</u>, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendant individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." <u>Moore v. Winebrenner</u>, 927 F.2d 1312, 1315 (4th Cir. 1991).

State Defendants argue that Plaintiff has failed to demonstrate specifically how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that these State Defendants violated his constitutional rights with respect to their responses to his administrative remedies. The evidence of record reveals that Defendant McBride denied Plaintiff's G-2, and Defendant Rubenstein denied Plaintiff's G-3. Plaintiff, however, has shown no other personal involvement by Defendants McBride and Rubenstein. In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. <u>Lewis v. Angelone</u>, 926 F. Supp. 69, 73 (W.D.Va. 1996). Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. <u>Miltier v. Born</u>, 896 F.2d 848, 854 - 55 (4th Cir. 1990). The undersigned finds that there is no evidence that State Defendants "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." State Defendants denied Plaintiff's

grievances based upon the medical opinions of the medical staff. The record reveals that Defendant McBride was not aware of Plaintiff's complaint that his treatment by Dr. Zaslau was being delayed until August 10, 2005. Plaintiff was treated by Dr. Zaslau on August 12, 2005, and Defendant Holmes scheduled Plaintiff's urethroplasty on August 16, 2005. Thus, Defendant McBride did not knowingly disregard Plaintiff's need for treatment by Dr. Zaslau when he denied Plaintiff's G-2 on August 16, 2005. Defendant Rubenstein was not aware of Plaintiff's complaint concerning the delay in treatment by Dr. Zaslau until August 25, 2005. In response, Defendant Rubenstein directed that Defendant Westfall respond to Plaintiff's G-1.[9] Mr. Hobbs responded to all claims, noting that the discontinuation of Plaintiff's medication was due to the surgical procedure performed by Dr. Zaslau on August 12, 2005. Based upon Mr. Hobbs' response, Defendant Rubenstein determined that Plaintiff was receiving adequate treatment. There is no evidence that Plaintiff filed any further grievances with Defendant Rubenstein, which would have made him aware of further delay in treatment.[10] Thus, Defendant Rubenstein did not knowingly disregard an excessive risk to Plaintiff's health and safety when he denied Plaintiff's G-3. Further, there is no evidence that State Defendants were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the prison physicians' conduct. Moreover, the dismissal of a non-medical defendant is appropriate where the defendant's sole involvement is the denial of an

---

[9]  Plaintiff's G-1 included claims of back pain, lack of medication, and delay in treatment by Dr. Zaslau.

[10]  Plaintiff argues that he is not required to file further grievance to exhaust his claim. The Court agrees that a claim is exhausted once a Plaintiff has complied with the administrative remedy process. Defendant Rubenstein, however, is not arguing that Plaintiff did not exhaust his claim. Defendant Rubenstein is asserting that he did not act with deliberate indifference because he was not aware that timely treatment was not being provided following his denial of Plaintiff's G-3.

administrative remedy request. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state *Bivens* claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a *Bivens* claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd, 70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). Accordingly, Plaintiff has improperly raised his claim against State Defendants under the doctrine of *respondeat superior* and has failed to establish supervisory liability. The undersigned therefore finds that Plaintiff's Motion for Summary Judgment should be denied as to the State Defendants and the State Defendants' Motion for Summary Judgment should be granted.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** Defendants' Motions for Summary Judgment (Document Nos. 85 and 88.), **DENY** Plaintiff's Motion for Summary Judgment (Document No. 149.), **DISMISS** Plaintiff's Complaint (Document No.1.) and remove this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Irene C. Berger. Pursuant

to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rule 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2255 of Title 28, United States Code, and Rule 45(e) of the Federal Rules of Criminal Procedure, the parties shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of these Findings and Recommendation within which to file with the Clerk of this Court, written objections, identifying the portions of the Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208, 104 S. Ct. 2395, 81 L. Ed. 2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Berger, and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Petitioner, who is acting *pro se*, and transmit a copy to counsel of record.

Date: March 23, 2010.

R. Clarke VanDervort
United States Magistrate Judge