### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

MICHAEL JAMES MOTTO,

Plaintiff,

v.                                                    CIVIL ACTION NO.  5:06-cv-00163

CORRECTIONAL MEDICAL SERVICES,
ST. LOUIS, MO, et al.,

Defendants.


### MEMORANDUM OPINION AND ORDER[1]


Plaintiff, an inmate at the Mount Olive Correctional Complex ("MOCC") in Mount Olive, West Virginia, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants failed to provide adequate medical care for the treatment of his urinary tract condition.  Pending before the Court are the parties' motions for summary judgment.

By Standing Order (Document No. 4) entered on July 21, 2004, and filed in this case on March 2, 2006, this action was referred to the Honorable R. Clarke VanDervort, United States Magistrate Judge, for submission to this Court of proposed findings of fact and recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).[2]  The assigned Magistrate Judge submitted his

---

[1]  Pursuant to the Court's September 30, 2010, Order in which the Court granted Defendants' Motions for Summary Judgment, denied Plaintiff's Motion for Summary Judgment, and indicated that a memorandum opinion setting forth specific findings and conclusions would follow.  This Court now issues its findings.

[2]  The Honorable Thomas E. Johnston, District Court Judge, referred this case back to the assigned Magistrate Judge for further proceedings, upon consideration of the Defendants' Motions to Dismiss.  (Memorandum Opinion and Order dated September 27, 2007 (Document No. 32).) This case was reassigned to the undersigned on November 23,

(continued...)

*Proposed Findings and Recommendation* ("PF&R") (Document No. 154) wherein it is recommended that this Court grant Defendants' Motions for Summary Judgment (Document Nos. 85 and 88), deny Plaintiff's Motion for Summary Judgment (Document No. 149), dismiss Plaintiff's Complaint (Document No. 1) and remove this matter from the Court's docket. Plaintiff has submitted objections to the PF&R. (Plaintiffs's [sic] Objections to Magistrate Judges [sic] Purposed [sic] Findings and Recommendation ("Objections") (Document No. 157)).

Upon consideration of the pending motions, the oppositions thereto, the replies, the parties' attached exhibits and the entire record herein, this Court adopts in part the PF&R and grants Defendants' Motions for Summary Judgment (Document Nos. 85 and 88) and denies Plaintiff's Motion for Summary Judgment (Document No. 149), for the reasons that follow.

## I. PERTINENT BACKGROUND AND PROCEDURAL HISTORY

The background and procedural posture of this case have been explained fully in the PF&R. This Court includes here only the substantive details. On March 2, 2006, Plaintiff, proceeding *pro se*, brought this action against the following individuals and entities: Mary Westfall, Health Services Administrator; Dr. Donald Holmes, Physician at MOCC;[3] Dr. Williamson, Physician at MOCC; James Rubenstein, Commissioner of Corrections of the State of West Virginia; Correctional Medical Services, St. Louis, MO ("CMS"); Correctional Medical Services, MOCC ("CMS"); West Virginia Division of Corrections, and the State of West Virginia. Pursuant to 42 U.S.C. § 1983 and the

---

[2](...continued)
2009. (Order (Document No. 148.))

[3] Plaintiff initially named Dr. Larry Holmes as a defendant in his Complaint. However, he later learned that the doctor's name is Donald Holmes. The Plaintiff was permitted to continue his suit against Dr. Donald Holmes. (Proposed Findings and Recommendation entered on August 27, 2007 (Document No. 27) at 15.)

Eighth Amendment to the United States Constitution, Plaintiff generally alleges that Defendants delayed and failed to provide appropriate medical care for his urinary tract condition. According to Plaintiff, Dr. Williamson referred him to a physician outside the MOCC for treatment of his urinary tract condition; that physician, Dr. Edgerton, diagnosed Plaintiff as having a urinary tract stricture on or about August, 2003, and that Dr. Edgerton then referred Plaintiff to a hospital in Morgantown, West Virginia, for treatment of the stricture. Plaintiff alleges that Defendants delayed his prescribed treatment until August, 2005, and that this two-year delay caused him to suffer infections and pain. Plaintiff also alleges that he did not receive prescribed follow-up treatment at the Morgantown hospital, which caused additional pain. Plaintiff asserts that the Defendants were deliberately indifferent to his medical treatment and that the medical providers were medically negligent. Plaintiff seeks monetary relief.[4]

Each Defendant moved to dismiss Plaintiff's Complaint. (*See* Document Nos. 8, 17.) Plaintiff subsequently moved to amend his Complaint to include as a defendant, then Warden of MOCC, Thomas McBride. (*See* Document No. 22.) On September 27, 2007, upon consideration of the various motions, the District Court concluded, *inter alia*, that Plaintiff sufficiently alleged an Eighth Amendment claim of deliberate indifference; that the Magistrate Judge appropriately considered Plaintiff's attempt to clarify his claims, in his responsive briefings, as additional allegations of his claims; that Plaintiff had the right to amend his Complaint once as a matter of course to add Thomas McBride as a defendant, and that Plaintiff asserted allegations which were sufficient to state a Section 1983 claim against Defendants CMS, Rubenstein and McBride. The

---

[4] Plaintiff also seeks an operation performed by Dr. Zaslau to relieve his urinary tract condition. This surgery has occurred since the filing of the instant litigation.

Court declined to dismiss Plaintiff's claims against Defendants Westfall, Williamson, and Holmes for insufficient service of process.  However, the Court found that the State of West Virginia and the Division of Corrections were immune from suit under the Eleventh Amendment and that Plaintiff's medical negligence claim should be dismissed because he failed to file a notice of claim as required by the West Virginia Medical Professional Liability Act. (Proposed Findings and Recommendation entered on August 27, 2007 (Document No. 27); Memorandum Opinion and Order entered on September 27, 2007 (Document No. 32); Dismissal Order (Document No. 33) (dismissing the State of West Virginia and the Department of Corrections.))

Thereafter, the parties engaged  in conducting discovery.  On March 4, 2008, Defendants filed the instant motions for summary judgment and memoranda in support. (James Rubenstein and Thomas McBride's Motion for Summary Judgment and Memorandum in Support of their Motion for Summary Judgment (Document Nos. 85 and 86); [Dr. Larry Williamson, Dr. Donald Holmes, Mary Westfall and CMS's] Motion for Summary Judgment and Memorandum in Support of their Motion for Summary Judgment (Document Nos. 88 and 89.))  On April 7, 2008, Plaintiff filed a General Response to Defense's Motions for Summary Judgement [sic] and Memorandum of Law (Document No. 104), Plaintiff's Objections to the Medical Defendants, Dr. Williamson, Dr. Holmes, Mary Westfall, and CMS' Motion for Summary Judgement [sic] and Memorandum of Law (Document No. 105),[5] and Plaintiff's Objections to James Rubenstein and Thomas McBride's Motion for Summary Judgement [sic] and Memorandum of Law in Support of these Objections (Document No. 107.)  In his General Response, Plaintiff asserted that discovery was not complete

---

[5]   The parties refer to Defendants Williamson, Holmes, Westfall and CMS as the "medical defendants" and Defendants Rubenstein and McBride as the "state defendants."  For consistency, this Court will do the same.

and that there were outstanding discovery requests for his medical records from Dr. Edgerton or Dr. Zaslau. (Document No. 104 at 2-3.)  Plaintiff also argued that Defendants sent his medical records in a time period that did not allow him to timely move for summary judgment. (*Id.*)

On September 16, 2008, the assigned Magistrate Judge conducted a hearing with respect to the status of discovery.  Plaintiff appeared in person and advised the court of the discovery materials he believed he still needed to oppose the Defendants motions for summary judgment.  By Order entered on March 3, 2009, the Magistrate Judge stayed the case in order to allow Plaintiff adequate time to file a response, if any, to address the merits of Defendants' motions. (Document No. 143.)[6] On December 1, 2009, Plaintiff filed his Motion for Summary Judgement [sic] (Document No. 149) and Memorandum in Support of Plaintiff's Motions for Summary Judgement [sic] and Further Objections to Defendants['] Motions for Summary Judgement [sic] (Document No. 150.) Defendants submitted responses thereto. (Document Nos. 151 and 152.)  The assigned Magistrate Judge subsequently terminated the stay of the case and thereafter issued the instant PF&R, to which Plaintiff asserted the objections discussed herein.

## II.  LEGAL STANDARDS AND APPLICABLE LAW

### A.  Standard of Review of the Magistrate Judge's PF&R

This Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C). However, the Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to

---

[6]  On May 27, 2009, Magistrate Judge VanDervort granted the Plaintiff's motion for an extension of the stay to afford Plaintiff additional time to obtain and review additional discovery materials and ordered Plaintiff to file a response to Defendants' motions for summary judgment within 180 days of the order.  (Order (Document No. 147.))

which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). When reviewing portions of the PF&R *de novo*, the Court will consider the fact that Plaintiff is acting *pro se*, and his pleadings will be accorded liberal construction. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978).

### B. Motion for Summary Judgment Standard of Review

The well-established standard in consideration of a motion for summary judgment is that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Hunt v. Cromartie,* 526 U.S. 541, 549 (1999); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A "material fact" is a fact that might affect the outcome of a party's case. *See Anderson,* 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Id*. The moving party bears the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Celotex Corp.,* 477 U.S. at 322-23. When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the non-moving party. *North American Precast, Inc. v. General Cas. Co. of Wis.*, Civil No.02:04-1306, 2008 WL 906334, *3 (4th Cir. Mar. 31, 2008). The nonmoving party must satisfy

his burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.  If the non-moving party fails to make a showing sufficient to establish the existence of an essential element, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23.  If factual issues exist that can only be resolved by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250.

     *C.  Applicable Law*

     Inmates can establish an Eighth Amendment violation with respect to medical care if they can prove that there has been deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "[A] medical need may be deemed objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Webb v. Driver*, 313 Fed. Appx. 591, 592 (4th Cir. 2008) (unpublished) (*quoting Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).  "The test for deliberate indifference has two parts.  First, whether the deprivation of medical care was sufficiently serious (objective component) and second, whether there existed a culpable state of mind (subjective component)*."  Harden v. Green*, 27 Fed. Appx. 173, 176 (4th Cir. 2001) (unpublished) (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  An inmate alleging an Eighth Amendment violation based on inadequate medical care must show that a prison official subjectively "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"An official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment."  (*Id*. at 838.)   The Fourth Circuit has cautioned that deliberate indifference is  "a very high standard [and] a showing of mere negligence will not meet it."  *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citation omitted). It is not enough under this standard that the inmate was the victim of negligence or even medical malpractice, and "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a [Section] 1983 claim unless exceptional circumstances are alleged. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).  Under some circumstances, a significant delay in medical treatment may give rise to a constitutional violation. *Webb v. Hamidullah*, 281 Fed. Appx. 159, 166 (4th Cir. 2008). However, "[a]n Eighth Amendment violation only occurs . . . if the delay results in some substantial harm to the patient." *Id*. (internal citations omitted); *see also Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) ("A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm."). Substantial harm may be most persuasively demonstrated where the delay in treatment causes further injury to the inmate, but the requirement may also be met where the delay causes unnecessarily prolonged pain and suffering. *Sealock v. Colorado*, 218 F.3d 1205, 1210 n.5 (10th Cir. 2000), cited in *Webb v. Driver*, 313 Fed. Appx. 591, 593 (4th Cir. 2008).

## IV.  DISCUSSION

### A.  Magistrate's Proposed Findings and Recommendation

The facts of this case and the assertions made in the parties' summary judgment motions are set forth fully in the Magistrate's PF&R, but will be discussed in detail herein, as applicable.  In his proposed findings and recommendation, the assigned United States Magistrate Judge assumed,

without finding, that  Plaintiff's medical condition was serious enough to give rise to an Eighth

Amendment claim.  Plaintiff did not object to that assumption.  Based on a review of the record, the

Magistrate Judge determined that Defendant Williamson treated Plaintiff from July, 2003, to

September, 2004.  During this treatment period, Defendant Williamson referred Plaintiff to Dr.

Edgerton six times for evaluation, ordered two CT Scans, a cystoscopy and ordered that an

appointment with Dr. Zaslau be scheduled, pursuant to Dr. Edgerton's recommendation.  Defendant

Holmes treated Plaintiff from November, 2004, to September, 2005, during which period Defendant

Holmes requested additional testing and arranged for four appointments with Dr. Zaslau. Contrary

to Plaintiff's contention that Defendant Williamson delayed his referral to an outside physician for

eight and one-half (8½) months and that Defendant Holmes delayed the referral to Dr. Zaslau, the

assigned Magistrate Judge found that there was no evidence that these Defendants knew of and

disregarded an excessive risk to Plaintiff's health or safety during the noted treatment periods.

Magistrate VanDervort declined to consider Plaintiff's assertion, in his motion for summary

judgment, that he received inadequate medication on grounds that Plaintiff failed to assert such a

claim in his Complaint.(PF&R at 12, n.2.)  However, the Magistrate Judge noted that Plaintiff

received pain medication throughout his treatment at MOCC. (*Id.*); (*see generally* PF&R at 25-37)

(for a discussion of the Magistrate's findings.)

     With respect to Defendant Westfall, Plaintiff alleges that she was deliberately indifferent to

his need to be referred to Dr. Zaslau when she failed to respond to his grievance.  The Magistrate

Judge concluded that at the time Plaintiff filed his grievances, he had an appointment scheduled with

Dr. Zaslau on August 12, 2005, but he was not informed of the appointment due to security reasons;

that Plaintiff was treated by Dr. Zaslau on August 12, 2005; that an additional appointment with Dr.

Zaslau was scheduled for September, 2005; that the appointment was cancelled; the September appointment was not rescheduled until December 28, 2005; Plaintiff failed to notify Defendant Westfall of any delay in rescheduling his September, 2005, appointment with Dr. Zaslau, and that the three month delay in rescheduling the September, 2005, appointment appears to have been the result of possible negligence on the part of the medical department.  Consequently, Magistrate VanDervort found that there was no indication that Defendant Westfall knew of and disregarded an excessive risk to Plaintiff's health or safety.

Magistrate VanDervort also considered Plaintiff's claims against CMS that the overall time frame of the delay in his medical care constituted "deliberate indifference" to his "serious medical needs."  The Magistrate Judge found that Plaintiff's claims against CMS failed because: (1) there was not a delay in arranging Plaintiff's urethroplasty, a medical procedure that was not deemed necessary until August 12, 2005, which did not occur for approximately seven months; (2) the medical department scheduled three appointments around that time and any delay in rescheduling Plaintiff's appointments appeared to have been the result of negligence, rather than deliberate indifference; (3) CMS could not be held liable under the doctrine of *respondeat superior* for the individual actions of its employees.  Further, the Magistrate Judge found equally unavailing Plaintiff's contentions that CMS and its staff failed to adhere to the American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC") standards as those standards do not establish the constitutional minima to demonstrate a violation of Plaintiff's constitutional rights.

Additionally, with respect to Plaintiff's claims that Defendants McBride and Rubenstein violated his constitutional rights through their responses to his administrative remedies, the

Magistrate Judge determined that Defendant McBride was not aware of Plaintiff's complaint that his treatment by Dr. Zaslau was being delayed until August 10, 2005.  The Magistrate further concluded that:  Plaintiff was treated by Dr. Zaslau on August 12, 2005; Defendant Holmes scheduled Plaintiff's urethroplasty on August 16, 2005; and that when Defendant McBride denied Plaintiff's G-2 grievance on August 16, 2005, he was not knowingly disregarding Plaintiff's need for treatment by Dr. Zaslau.  Further, the Magistrate Judge found that Defendant Rubenstein was not aware of Plaintiff's complaint concerning any alleged delay in treatment until August 25, 2005, when he received Plaintiff's G-3 grievance.  Upon receipt of the grievance, Defendant Rubenstein directed Defendants McBride and Westfall to review and respond to Plaintiff's G-1 grievance. Defendant Rubenstein determined that Plaintiff was receiving adequate medical care based upon the response of the medical personnel who responded to the G-1 grievance.  The Magistrate concluded that Defendant Rubenstein did not knowingly disregard an excessive risk to Plaintiff's health and safety since there is no evidence that Plaintiff filed any further grievances with Defendant Rubenstein with respect to any alleged delay in medical treatment.  The Magistrate concluded that there is no evidence in the record that either Defendants McBride or Rubenstein were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment or tacitly authorized the prison physicians' conduct.  The Magistrate also found that outside of Defendants McBride's and Rubenstein's denial of Plaintiff's grievance, Plaintiff did not show any other personal involvement with his medical treatment and that there was no evidence that these Defendants "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm."  Thus, given the improperly raised claim of liability under the doctrine of *respondeat*

-11-

*superior* and the Plaintiff's failure to establish supervisory liability, the Magistrate Judge granted the State Defendants' motion for summary judgment.

### B. Objections

To the extent that Plaintiff has asserted general objections in a manner that is merely a restatement of arguments previously considered by the Magistrate Judge, (*see* Objections at 13), the Court declines to address those matters. *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982) (this Court need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations.") However, Plaintiff has submitted five specific objections in response to the PF&R. This Court will address each in turn.

### (1)    Claim With Respect to Inadequate Pain Medication

Plaintiff challenges the Magistrate Judge's failure to consider his assertions that he was not provided adequate pain medication. Plaintiff asserts that in his original Complaint he stated that he was in pain for three (3) years; that he submitted administrative grievances in August, 2005, wherein he "mentioned the inadequate pain medications"; and that the District Court recognized this claim when it included in its background section of the September 27, 2007, Memorandum Opinion and Order that he alleged a delay in medical care that caused him to suffer infections and pain. (Objections at 1.) Plaintiff also asserts that the Court should give a liberal reading to his Complaint because he is proceeding *pro se* and that such a reading requires the inclusion of an inadequate pain medication claim "even though [he] did not use the words 'insufficient pain medication[]'" in his Complaint. (*Id* at 2.) Plaintiff maintains that even without a liberal reading, he has stated in his

Complaint that "he suffered [three (3)] years of pain, that [that pain] could have been taken care of as easily as [by] a stronger pain medication[]" which he contends constitutes deliberate indifference. (*Id.*)

This Court **SUSTAINS** Plaintiff's objection that the Magistrate Judge should have considered his claim for inadequate pain medication.  Plaintiff concedes that he did not assert such a claim in his original Complaint.  However, the District Court in its September 27, 2007, Memorandum Opinion and Order gave a liberal construction to Plaintiff's pleading and his responsive briefs to Defendants' motions to dismiss.  The Court  interpreted Plaintiff's request in those briefs to "clarify" his claims, as a motion to amend his complaint.  The Court granted the motion and declared that the allegations in Plaintiff's responsive briefs would be considered a part of Plaintiff's Complaint.  (*See Motto v. Corr. Med. Serv.*, Civil Action No.5:06-cv-00163, 2007 WL 2897854, at 3 (S.D. W. Va. Sept. 27, 2007)).

In Plaintiff's response to the Medical Defendants' motion to dismiss, Plaintiff stated that:

> The deliberate decisions made by Ms. Westfall, Dr. Williamson, Dr. Holmes and CMS to delay this necessary surgery and extend the pain [and] suffering of the Plaintiff surely constitutes medical malpractice[,] [d]eliberate [m]edical [i]ndifference and [d]eliberate [m]edical neglect on the part of the above named defendants.  The pain and suffering was never fully aleveated [sic] as the Doctors named in this case never provided adequate pain medication.  Thus[,] another conscience decision by the defendants to prolong the plaintiff's pain [and] suffering.

(Plaintiff's Objections and Response to Defendants Mary Westfall, Larry Williamson, M.D., Correctional Medical Services Inc. and Donald Holmes, M.D., Motion to Dismiss (Document No. 25) at 8).  Thus, Plaintiff did assert a claim with respect to the provision of adequate pain medication and the Magistrate Judge's failure to consider the claim was improper.  However, this Court rejects

Plaintiff's arguments in his Objections with respect to his issue.  This Court finds it unnecessary on these facts to make any finding herein with respect to whether a claim alleging a delay in scheduling a medical appointment which results in pain and suffering is the same as a claim with respect to the provision of adequate pain medication.  Therefore, to the extent Plaintiff asserts that these claims are one and the same the Court overrules such objection.

Based on the foregoing findings, this Court will review the specific portion of Plaintiff's Motion for Summary Judgment with respect to this claim *de novo*.  In his motion for summary judgment, Plaintiff asserts that he "was left with inadequate pain medication for the entire time [of his treatment] from the day he was diagnosed by Dr. Edgerton and the time of the second surgery by Dr. Zaslau in March of 2006." (Plaintiff's Motion for Summary Judgement [sic] ("Pl.'s Motion") (Document No. 149) at 1); *see also* Plaintiff's Objections to the Medical Defendants Dr. Williamson, Dr. Holmes, Mary Westfall and CMS' Motion for Summary Judgement [sic] and Memorandum of Law ("Pl.'s Oppn. to Med. Defs.") (Document No. 105) at 3) (wherein Plaintiff states that he "placed another sick call slip on the 15th of May[] 2004 complaining the percogesic, which was wholly insufficient, was not renewed, again not sufficient pain medication.") Plaintiff also asserted that the "strongest pain reliever [he] was given [from August 2003 until March 1, 2006] was Motrin[] and Fioriset[,]" but the Fioriset was prescribed for his headaches.  (Pl.'s Oppn. to Med. Defs. at 10-11.) Plaintiff argues that when he suffered a similar urinary ailment in 2002, a physician prescribed "pain killers that were sufficient." (*Id.* at 11.)

In opposition, the Medical Defendants first object to Plaintiff's "attempt to convert this lawsuit into one about the provision of pain medication[.]"  (Medical Defendants' Response to Plaintiff's Motion for Summary Judgment and Further Objections to Defendants' Motions for

Summary Judgment ("Med. Defs.' Oppn.") (Document No. 151) at 5.)  The Medical Defendants contend that they lacked notice of this claim because it was not included in Plaintiff's Complaint and that they have not had the opportunity to provide the Court with "affidavits attesting to their provision of pain medication to the Plaintiff over the course of several years treating him." (*Id.* at 5-6.)  The Medical Defendants next contend that, despite not obtaining any affidavits, the record before the Court demonstrates that they did not act with deliberate indifference to the Plaintiff's need for pain medication.  The Medical Defendants argue that Plaintiff failed to apprise any of the Defendants that he felt he needed additional pain medication, and that "none of these Defendants ever had the opportunity to assess the Plaintiff's complaint that his medication was insufficient and make a medical decision as to whether the medication should be changed." (Med. Defs.' Oppn. at 6-7.)  In support of their assertions, the Medical Defendants argue that Plaintiff's own evidence demonstrates that he failed to apprise any of the Medical Defendants that he felt he needed additional pain medication.

To state a valid Eighth Amendment claim for failure to provide adequate medical care, a plaintiff must demonstrate that the defendant acted with deliberate indifference to a prisoner's serious medical needs.  *Estelle*, 429 U.S. at 104. The indifference must be objectively harmful enough to establish a constitutional violation.  *See Farmer*, 511 U.S. at 837-40 (1994).  Moreover, an inmate alleging an Eighth Amendment violation based on inadequate medical care must show that a prison official subjectively "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." (*Id.* at 837).

First, this Court finds the Medical Defendants' assertion that they had no notice of Plaintiff's claim disingenuous in light of the District Court's September 27, 2007, ruling that Plaintiff's allegations in his responsive briefs were a part of Plaintiff's Complaint. This Court observes that Plaintiff made a similar argument with respect to the pain medication he received in opposition to the Medical Defendants' Motion for Summary Judgment. (*See* Pl.'s Oppn. to Med. Defs. at 3, 13.) These filings were made prior to the Magistrate Judge's September 16, 2008, status conference during which the Magistrate Judge inquired whether the parties needed any additional discovery. During the conference, the Medical Defendants indicated that they did not need any additional discovery. Thus, the Court finds the Medical Defendants did have notice of Plaintiff's claims, yet they did not seek to supply the Court with the affidavits to which they now refer. As a result, the Medical Defendants are not prejudiced by this Court's consideration of Plaintiff's claim for inadequate pain medication, to the extent that they appear to indicate otherwise. Therefore, the Court finds the Medical Defendants' first argument is wholly without merit.

However, this Court has reviewed the exhibits offered by Plaintiff and finds that Plaintiff has not provided the Court with any evidence that he advised the Medical Defendants that his prescribed pain medication was insufficient to relieve his kidney pain prior to August 8, 2005. With respect to the August 8th complaint, the Court finds that Plaintiff submitted a G-1 Grievance on August 3, 2005, advising that the medication, Indocin, which he contended was prescribed for kidney pain associated with the restriction in his urinary tract, was discontinued without explanation. (*See* Plaintiff's Objections to James Rubenstein and Thomas McBride's Motion for Summary Judgement [sic] and Memorandum of Law in [S]upport of [T]hese Objections ("Pl.'s Oppn. to State Defs."), Pl.'s G-1 Grievance, Pl.'s Ex. A-2 (Document No. 107-1) at 4-6.) Plaintiff sought an explanation

-16-

regarding why this medication was stopped; however, he did not advise that this medication was not adequate to relieve his pain.[7]   Within five days, on August 8, 2005, Plaintiff was seen by medical personnel who informed him that the Aspirin and Incodin medications were discontinued in preparation for his upcoming scheduled surgical procedure with Dr. Zaslau.  (*See* Plaintiff's Doctor's Order Sheet, Pl.'s Ex. E-4 (Document No. 107-2) at 13) (wherein there is a notation that Plaintiff is not to receive aspirin or NSAID's for ten (10) days prior to surgery.); *see also* September 28, 2005, Letter from Keith Hobbs, RN, CMS Director of Nursing at MOCC to Plaintiff, Pl.'s Ex. A-7, (Document No. 107-1) at 13) (advising that the Aspirin and Indocin were discontinued due to an upcoming surgery.))   On August 8, 2005, the medical provider prescribed another pain medication, Ultram, to help relieve Plaintiff's discomfort.  It was with respect to this prescription that Plaintiff first complained that his prescribed pain medications were inadequate.  (*See* Plaintiff's G-2 Grievance Form, Ex. A-3   (Document No. 107-1) at 8) (wherein Plaintiff stated, "I was prescribed some Ultrim [sic] on [August ] 8th[,] [b]ut its not enough for [the] pain I am experiencing, when at Medical on [August] 8th they did explain the [h]old on the aspirin based meds due to an upcoming surgery.  Why would they put a hold on one pain killer and not prescribe something else in its place until the surgery is done[?]") This Court finds this explanation reasonable given Dr. Zaslau's pre-operation orders. On August 12, 2005, Dr. Zaslau performed a retrograde urethrogram, urethroscopy, cystogram and open vesicostomy.  (West Virginia University Hospital Department of Urology Operation Summary, Pl.'s Ex. E-1 (Document No. 107-2) at 1.)  Dr. Zaslau noted in his Operation Summary that Plaintiff was provided "Bactrim for antibiotic prophylaxis as

---

[7]  Likewise, on May 15, 2004, Plaintiff submitted an Inmate Medical Services Request Form (wherein he stated that his Percogesic, a pain medication, was not renewed and that the  medication was for his kidney pain.  (*See* Plaintiff's Ex. E-12.) Contrary to the argument in his briefing, Plaintiff did not assert in this medical service request that the prescribed medication was inadequate.

well as Percocet for pain control." (*Id*. at 3.) This Court finds that the temporary use of Ultram to manage Plaintiff's various medical ailments prior to Plaintiff's surgery does not demonstrate that the Medical Defendants were deliberately indifferent to Plaintiff's medical condition. This Court observes that Plaintiff included among his exhibits a Physicians' Order form which indicates that in September, 2005, he was returned back to the Indocin pain medication that he previously stated he needed to combat his kidney pain. (Pl.'s Ex. C-1 (Document No. 107-1) at 23.)

Plaintiff did not present any other evidence of complaints with respect to his prescribed pain medication. Moreover, this Court has reviewed the Plaintiff's medical records attached to Defendants' motion for summary judgment and finds–as did the Magistrate Judge–that Plaintiff has been prescribed pain medication during the time period in dispute. The record reveals that Plaintiff was prescribed various pain medications that includes Aspirin, Motrin, Ibuprofen, Ultram, Indocin, Percogesic, Fioricet, Percocet and Lortab. Although Plaintiff alleges that he has experienced pain and suffering for three (3) years, there is no indication that he sought stronger pain medication and was refused such medication by any of the Defendants.[8] The Court also finds that Plaintiff has been prescribed Cipro, Keflex and Bactrim antibiotics to combat any infections associated with his urinary tract condition. (*See* Affidavit of Larry Williamson, (Document No. 88-2), ¶5 ("I saw [Plaintiff] on July 24[, 2003] at which time he complained of pain in his right kidney and nausea. I assessed him as being a morbidly obese male in no acute distress.")) Furthermore, a review of the Plaintiff's medical records reveals that on numerous occasions Plaintiff submitted Medical Service Requests for pain medication or nerve blockers to combat his headaches. Thus, the Plaintiff knew how to alert the medical providers that he had concerns with respect to his kidney pain medication;

---

[8]   The Court notes that Plaintiff's medical records indicate that he has an allergy to morphine and codeine.

however, there is no evidence that he did so. Plaintiff asserts that he was previously provided pain medication when he suffered a similar ailment in 2002. However, he does not detail the medication he received, the dosages or the length of time the medication was prescribed.

Assuming Plaintiff's urinary tract condition raises an Eighth Amendment claim, this Court finds that Plaintiff has failed to demonstrate deliberate indifference in his treatment through pain medication. While it is clear that Plaintiff asserts he suffered a great deal of pain as a result of the allegedly deficient medical treatment and delayed consultations and surgery, such an assertion of pain and suffering does not support a claim that the medication he received was inadequate. Further, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a [Section] 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, "[t]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." *Malcomb v. Raja*, Civil Action No.2:09-cv-0647, 2010 WL 3812354, at *1 (S.D. W. Va. Sept. 22, 2010) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977)). In light of the foregoing findings, drawing all reasonable inferences in favor of the non-moving party–on this claim, the Medical Defendants–this Court finds that Plaintiff's claim with respect to the provision of adequate pain medication does not constitute deliberate indifference and thus, he is not entitled to summary judgment as a matter of law.

Plaintiff did not object to the Magistrate Judge's finding that his argument that the Medical Defendants clearly violated his constitutional rights by failing to comply with the standards of the ACA and NCCHC, was without merit. Therefore, Plaintiff's Motion for Summary Judgment (Document No. 149) is **DENIED**.

*(2)     Testimony of Witnesses*

Plaintiff contends that summary judgment should be precluded in this case because "[his] witnesses [were] not . . . interviewed by Mr. Wandling, [counsel for the State Defendants,] as verbally ordered by the [Magistrate] Judge on September 16, 2008 in [the] Courtroom at the hearing." (Objection at 3.)  Plaintiff contends that the testimony of Dr. Zaslau and Dr. Edgerton is "germane to this case [as] the information gathered would likely change the outcome of the Magistrate Judge's PF&R." (*Id.*)  Specifically, Plaintiff contends that he "is sure that [Dr. Zaslau] would testify to the delay in treatment [sic] allowed the stricture to become significant and thus preventing the surgery in August of 2005 [from] being a success[]"(*id.* at 3-4); that Dr. Zaslau told him in the recovery room that "the guide wire would not pass through [his stricture] and [that] he would see the Plaintiff back in 2 to 3 weeks[]"(*id.* at 9); and that Dr. Edgerton "would [have] testified to the fact that he and the Plaintiff discussed [Dr. Edgerton] sending the Plaintiff to Morgantown as far back as the August 19, 2003 appointment when the Doctor first diagnosed the Plaintiff as having the recurrent stricture." (*Id.* at 4-5.)   Plaintiff also asserts that he previously sought an order from the Court to permit him to conduct witness interviews and sought appointment of counsel to assist in the conduct of these interviews.

For the reasons that follow, this Court **OVERRULES** Plaintiff's objection.  First, this Court finds that Plaintiff misrepresents facts in that the assigned Magistrate Judge did not make a "verbal" order directing Mr. Wandling or anyone else to conduct any witness interviews. At the September 16, 2008, status conference, Magistrate VanDervort inquired whether (1) Defendants fully and fairly responded to Plaintiff's discovery requests, (2) additional time was needed for adequate discovery, (3) Plaintiff has been provided with a copy of all documents contained in his medical and prison

records germane to his claims in this case, and (4) there were any other issues pertaining to the proceedings in this case which the parties wish to raise. (Order (Document No. 124.)) This Court has listened to a recording of the September 16, 2008, status conference. Plaintiff informed the Magistrate Judge that he had not provided Defendants with a "witness list," presumably in response to Defendants' interrogatories. (Status Conference at 15:25; [Medical Defendants'] Motion for Summary Judgment, Ex. Plaintiff's Answers to the Defense's First Set of Interrogatories (Document No. 88-23) at 2.) Magistrate Judge VanDervort generally detailed why such lists were important and helpful to litigation. (Status Conference at 15:36-16:21.) In his explanation, the Magistrate Judge discussed that a party could provide such lists and a brief statement respecting what the witnesses may say. However, he warned that sometimes witnesses who are contacted may not say what one believes that they will. (Status Conference at 16:21-16:26.) The Magistrate Judge further explained that "these lawyers don't have to [contact witnesses] but if [counsel for Defendants] see a problem with what you are presenting then it would benefit them to contact these others and then share the information they obtained with you." (Status Conference at 16:30-17:26.) This Court finds that there was no order to counsel for Defendants to conduct any witness interviews. Indeed, Magistrate Judge VanDervort did not order Plaintiff to provide any of the Defendants with a witness list, instead he told Plaintiff "to use [his] best judgment." (Status Conference at 17:14-17:20.) This Court finds that the Magistrate Judge's discussion at the September 16, 2008, conference was general in nature, that he specifically stated that counsel for Defendants did not have to conduct such interviews and that he was not giving Plaintiff any advice. These findings are supported by Magistrate Judge VanDervert's written Order which memorialized what occurred at the September 16, 2008, status conference. (September 26, 2008 Order (Document No. 124.)) There is no

-21-

reference to any order directing Mr. Wandling or any other attorney to conduct witness interviews. Moreover, the Court finds that counsel for Defendants specifically advised at the hearing that they did not see a need to interview Plaintiff's treating physicians as they believed there was sufficient evidence that their clients were not acting deliberately indifferent. (Status Conference at 10:26-12:15.) Therefore, Plaintiff could not have reasonably believed that counsel for Defendants were ordered to conduct witness interviews and to provide him with the substance thereof.

Second, this Court finds that Plaintiff, in response to the Magistrate's inquiry with respect to what he needed to oppose the pending motions for summary judgment, listed the following: (1) Dr. Peter Edgerton's office charts and notes, (2) Dr. Stanley Zaslau's office charts and notes, and (3) the Fourth Edition of the ACA Manual used by MOCC. Plaintiff indicated that he had all the prison records which were germane to the case. Magistrate Judge VanDervort construed Plaintiff's first two requests as an oral motion for subpoenas and granted the motion. He also directed counsel for Defendants to provide Plaintiff with a copy of the ACA manual and pertinent portions of the CMS policy and procedures manual. (*Id*. at 2.) This Court finds that the Magistrate Judge adequately ensured that Plaintiff had what he felt he needed to oppose the motions.

Third, this Court finds that Plaintiff had ample opportunity after that September 16, 2008, status conference to, again, move for leave to conduct such interviews or to obtain any discovery he felt he was owed by the Defendants, but he failed to do so. The assigned Magistrate Judge stayed this case on March 3, 2009, in order to allow Plaintiff adequate time to file a response to the Defendants' motions for summary judgment. (Document No. 143.) Plaintiff subsequently sought and was granted an extension of that stay to afford him additional time to obtain and review the

ACA and NCCHC manuals.  (Document Nos. 146, 147.))[9]  This Court finds that Plaintiff did not assert a need to interview  Dr. Zaslau or Dr. Edgerton.  Even if this Court were to lend credit to Plaintiff's assertion that Magistrate Judge VanDervort ordered Mr. Wandling to provide him information with respect to witness interviews, Plaintiff clearly did not advise the Magistrate Judge that counsel for Defendants failed to provide this information or that the information was necessary to oppose the Defendants' dispositive motions.

Finally, with respect to Plaintiff's contentions that he previously sought a court order to permit him to interview these witnesses (*see* Plaintiff's Motion for Court Order (Document No. 106)), this Court finds that Magistrate Judge VanDervort denied the motion as untimely, with several other discovery requests made by Plaintiff, after considering that Plaintiff "commenced . . . [discovery] on January 3, 2008 [nearly three months after the court entered the October 4, 2007 Time Frame Order and] about one month before the scheduled close of discovery."  (August 21, 2008 Order (Document No. 121.))  The Magistrate Judge also denied Plaintiff's request for the appointment of counsel–which Plaintiff contended was necessary to assist with conducting witness interviews and depositions–by finding that this case did not meet the exceptional circumstances standard at this juncture in the litigation.  (*Id.* at 3-4.)   Pursuant to 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel."  However, there is no constitutional right to appointment of counsel in civil cases.  "[A] plaintiff must present "exceptional circumstances."  *Harris v. Salley*, 339 Fed. Appx. 281, 284 (4th Cir. 2009) (quoting *Miller v. Simmons*, 814 F.2d 962, 966 (4th Cir. 1987).  Such "[e]xceptional circumstances exist where a pro se litigant has a colorable claim but lacks the capacity to present it." *Whisenant v. Yuam*,

_____

[9] (*See supra* n.6.)

739 F.2d 160, 163 (4th Cir. 1984), *abrogated on other grounds by Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989).   The Magistrate Judge considered the purpose Plaintiff offered for appointment of counsel and concluded, *inter alia*, that "as a practical matter evidence in the form of documents will be the strongest indication of the merit *vel non* of Plaintiff's claims and Defendants' responses to them[]" and that the factual and legal issues presented by Plaintiff's claims did not appear to be complex. (*Id.* at 3.)   Plaintiff did not seek reconsideration of this ruling and any attempt to infer that he is somehow prejudiced by that ruling is baseless. This Court finds that the claims Plaintiff has presented in the instant action are not complex and he has, as evidenced by the record in this case, demonstrated his capacity to present his claims adequately.   Moreover, Plaintiff's assertions with respect to what Dr. Edgerton or Dr. Zaslau would have stated–that he needed surgery on August 19, 2003, or that the delay in his surgery required additional surgeries–is not supported by Plaintiff's medical records.   Plaintiff sought and obtained the office charts and notes from each doctor, but failed to present any evidence to support these assertions. Thus, for all of these reasons, Plaintiff's second objection is **OVERRULED**.

### (3)    *Purported Delay in Treatment*

Plaintiff next objects to the Magistrate Judge's consideration of his medical records as it relates to the treatment he received from Defendants Dr. Williamson and Dr. Holmes.  (Objections at 5-10.) Plaintiff maintains that there was a delay in his treatment which demonstrates the doctors' deliberate indifference to his care. (*Id.*)  This Court finds that Plaintiff's objections are merely reformulated assertions of his arguments in his opposition brief that there was a delay in the treatment he received by Drs. Williamson and Holmes.  This Court has reviewed Plaintiff's medical records and finds that there was no significant delay in Plaintiff's medical care which support a

claim for deliberate indifference.  Additionally, Plaintiff has not presented any material fact that would preclude a finding of summary judgment in these Defendants' favor.  Therefore, upon the following findings, Plaintiff's objections are **OVERRULED**.

Plaintiff concedes that Dr. Williamson made the referrals upon which the Magistrate Judge relied in his PF&R (Objections at 13.)  However, Plaintiff asserts that the referrals were not timely. (*Id.*) Plaintiff, specifically, contends that Dr Williamson: (1) did not prescribe pain medication when he presented with pain of his right kidney and nausea;[10] (2) delayed scheduling his CT Scan for two (2) weeks; (3) delayed approving the consult request for a referral back to Dr. Edgerton for five months and six days after his CT Scan; (4) "held [a] referral up" for 30 days for a follow-up appoint with Dr. Edgerton in July, 2004; and (5) failed to make an appointment with Dr. Zaslau prior to leaving his employment with CMS at MOCC in September, 2004.  (Objections at 5-7.)

A review of Plaintiff's medical records indicate that Dr. Williamson treated Plaintiff from July, 2003 to September, 2004.  During that time Dr. Williamson consistently examined, tested, monitored and assessed Plaintiff's urinary tract condition.  Dr. Williamson also referred Plaintiff, on several occasions, to Dr. Edgerton, a physician outside MOCC, for further consultation and tests. This Court finds that Plaintiff's assertions that Dr. Edgerton advised him on August 19, 2003, that he needed surgery is not borne out by the record.  Dr. Edgerton noted, with respect to the August 19, 2003, appointment, that tests were needed with respect to Plaintiff's medical condition. (Provider Consultation Report, Pl.'s Ex. E-2 (Document No. 107-2) at 4.)  He ordered a CT Scan of Plaintiff's abdomen and pelvis, urine analysis, blood work and self meatal dilation. (*Id.*)  The CT Scan was performed on September 16, 2003.  (Radiology Report, Pl.'s Ex. E-5 (Document No. 107-2) at 14.)

---

[10]   This Court considered and rejected this assertion above. No additional findings are warranted.

Plaintiff was not seen by Dr. Edgerton again until February 24, 2004.  Dr. Edgerton did not provide a recommendation for any surgical procedures at this appointment.  Instead, he noted that additional follow-up testing in the form of another CT Scan of Plaintiff's abdomen was needed.  (Provider Consultation Report, Pl.'s Ex. E-8 (Document No. 107-2) at 17.)  He also appeared to consider whether a cystoscopy was required; the Court notes that there was a question mark by his reference to cystoscopy.  (*Id.*)  After a host of tests were performed on Plaintiff and referrals were made for Dr. Edgerton to consult on his condition,[11] a urethral stricture was noted on June 1, 2004. (Radiology Report, Pl.'s Ex. E-13 (Document No. 107-2) at 23.)  On July 9, 2004, Dr. Williamson again referred Plaintiff back to Dr. Edgerton for Dr. Edgerton's consideration of a visual urethrotomy or skin graft as treatment options for Plaintiff's condition. (CMS' Off-Site Health /Emergency Room Referral, Pl.'s Ex. E-14 (Document No. 107-2) at 24.)  Contrary to Plaintiff's assertions, any consideration of surgery as a treatment option to relieve his urinary condition did not arise until July 22, 2004. It was on this date that Dr. Edgerton provided four different treatment options for Plaintiff's condition: (1) resection of stricture with end to end anastomosis ("Best Results"), (2) resection with skin graft, (3) visual urethrotomy, and (4) urethral dilation.  (*See* Pl.'s Ex. E-15 at 25; Med. Defs.' Ex. 2, ¶ 8.)  Dr. Williamson stated in his affidavit that he reviewed Dr. Edgerton's report on July 27, 2004, and apprised Plaintiff of these options in August 2, 2004. (Affidavit of Dr. Larry Williamson, M.D., Med. Defs.' Ex. 2,  ¶9.)  Dr. Williamson asserts that he attempted to get Plaintiff an

---

[11]   On February 24, 2004, Dr. Williamson approved of the tests  recommended by Dr. Edgerton and a CT Scan was performed on Plaintiff on March 18, 2004. The results were forwarded to CMS' Medical Department on March 22, 2004. (Radiology Report, Pl.'s Ex. E-9 (Document No. 107-2) at 19.)  On March 23, 2004, Dr. Williamson asked Dr. Edgerton to review the Plaintiff's latest test results and to make a recommendation.  (*See* Correctional Medical Services Off-Site Health Emergency Room Referral, Pl.'s E-10 (Document No. 107-2) at 20.)  On April 26, 2004, Dr. Williamson "requested a cystogram (a radiograph of the patient's bladder) via cystoscopy to be performed by Dr. Edgerton." (Affidavit of Larry Williamson, M.D., Med. Def.'s Ex.2, ¶ 7 (Document No. 88-2.))  The procedure was performed on June 1, 2004.

appointment with the University Health Associates in Morgantown, West Virginia.  However, he was unable to do so.  He left CMS at MOCC on September 9, 2004.  Plaintiff's medical records included a note that Dr. Williamson would refer Plaintiff to the University Health Associates and that "April is currently arranging MOTV appointment."  (CMS' Interdisciplinary Progress Notes, Med. Defs.' Ex.00360, (Document No. 88-9.)

Viewing the evidence in the light most favorable to Plaintiff and affording all reasonable inferences to him, this Court finds that there were no significant delays in Plaintiff's medical care which evinces deliberate indifference.  This is so because Plaintiff's medical condition was consistently assessed and considered by Dr. Williamson on what appears to be, at one point, a monthly basis.  The record is replete with the entries of Plaintiff's various visits with MOCC medical providers or outside consultants.  It appears that Dr. Williamson attempted to properly assess Plaintiff's medical problem and develop a course of treatment for his illness, which apparently was recurrent, through various tests and consultations with Dr. Edgerton. (*See* Affidavit of Dr. Larry Williamson, M.D., Med. Defs.' Ex. 2, ¶ 6) (wherein he sates "I wanted Dr. Edgerton to rule out a possible tumor in the patient's bladder as suggested by the CT Scan.")  While Plaintiff may have disagreed with the time it took to determine his treatment options, such a disagreement with Dr. Williamson's judgment does not establish a claim for deliberate indifference.  Moreover, such questions of medical judgment are not subject to judicial review. *Russell v. Sheffer,* 528 F.2d 318 (4th Cir.1975).  However, even if this Court accepts Plaintiff's assertions of delays in the timeliness of scheduling his appointments or in approving referrals to "outside" physicians, this Court finds that any wrongdoing on the part of  Dr. Williamson is, at its worst, negligence.  A finding of deliberate indifference requires more than a showing of negligence. *Morrell v. United*

*States*, Civil Action No.5:05CV171, 2007 U.S. Dist. LEXIS 27286, *5 (N.D. W. Va. Apr. 12, 2007)

(citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).  As such, Plaintiff is not entitled to summary

judgment by law on facts that demonstrate mere negligence. Plaintiff's medical record does not

show that Dr. Williamson intentionally refused to treat Plaintiff or to submit referrals to an outside

physician for further evaluation and consultation.  There is no evidence that Defendant Williamson

acted in a wanton manner in his treatment of Plaintiff.

The facts disputed by Plaintiff in his Objections with respect to Dr. Holmes are also

insufficient to raise a genuine issue of a material fact that would preclude summary judgment. With

respect to Dr. Holmes, Plaintiff disputes a statement made in Dr. Holmes' affidavit that he refused

to go to his appointment with Dr. Zaslau on March 21, 2005.  Instead, Plaintiff argues that he

refused an appointment on March 14, 2005, due to a stomach flu.  He further asserts that his

appointment "[a]pparently . . . was rescheduled for the next week[, March 21, 2005]" since Dr.

Holmes referenced March 21, 2005 [in his affidavit] and that this appointment was cancelled by

"medical." (Objections at 8).  Plaintiff concludes that "the delay from March 21[,] 2005 to May 2[,]

2005 can no longer be blamed on [him], it was someone else and [he] contends that it was most

likely medical again."  (*Id.*) Contrary to Plaintiff's assertion, his medical records reveal that the

medical department, in December, 2004, scheduled an appointment with Dr. Zaslau for a urology

consultation for March 21, 2005. (CMS' Interdisciplinary Progress Notes, Med. Defs.' Ex. 00363,

(Document No. 88-9.)   Plaintiff's medical chart indicated that this was the next available

appointment.  (*Id.*)  MOCC officials attempted to transport Plaintiff to his appointment with Dr.

Zaslau on March 14, 2005.  There is no explanation in the record with respect to when or why

Plaintiff's appointment was changed to March 14, 2005, one week earlier than the originally

scheduled appointment or whether his transport to Dr. Zaslau's office would have taken a week. However, there is no dispute in the record that on March 14, 2005, when Plaintiff was advised that he was to be transported to Ruby Memorial Hospital for a urology evaluation, he refused to go.  (*See* Pl.'s Ex. E-20 (Document No. 107-2) at 33) (Plaintiff's acknowledgment of his refusal to go and release of CMS from all responsibility of the "ill effect which may result from this action.") Plaintiff, in his Objections, "clarifies" the reason that he refused to go to the appointment. (Objections at 7-8.)  Plaintiff asserts that he was sick with the stomach flu.  While this Court does not intend to minimize or make light of such an illness, this explanation does not negate that Plaintiff refused to go to the appointment.   Thus, there is no permissible inference that can be drawn from Plaintiff's assertion that he had an appointment on March 21, 2005, which was cancelled by someone other than him.  The evidence reveals otherwise and does not support any claim that Dr. Holmes acted with deliberate indifference by delaying his medical treatment.

Plaintiff also contends that he provided the Court with an exhibit which shows that his surgery was first scheduled for May 13, 2005, but the Defendant and the Magistrate Judge "refused] to talk about [the appointment.]" (Objections at 13; *see also id.* at 8.)  This Court finds that the appointment to which Plaintiff refers was actually a follow-up appointment with Dr. Zaslau, not one for a surgical procedure. (CMS' Physician's Orders, Med. Defs.' Ex. 00776 (Document No. 88-21.) Plaintiff's March 14, 2005, appointment was  rescheduled for May 2, 2005.  During the May 2, 2005, appointment, Dr. Zaslau did not immediately order any surgery for Plaintiff.  Instead, the doctor provided an assessment of Plaintiff as having a urethral stricture, but noted that its length and location were unknown.  (*See* May 9, 2005 Letter from Dr. Stanley Zaslau to MOCC, Pl.'s Ex. E-21 (Document No. 107-2.) at 35) (Dr. Zaslau indicates that he wanted to evaluate Plaintiff with a

cystoscopy and retrograde urethrography. He also noted that "we may consider retrograde pyelogram because [Plaintiff] also mentions a history of ureteropelvic junction obstruction. We will set this procedure up and will see him and advise shortly thereafter.") There is no explanation in the record for why Plaintiff's follow-up appointment with Dr. Zaslau did not occur on May 13, 2005. (*See* CMS' Physician's Orders, Med. Defs.' Ex. 00776 (Document No. 88-21.) However, the Court notes that (1) Dr. Zaslau stated that he would schedule the procedure; (2) Dr. Zaslau's May 9, 2005, letter was not received in CMS's Medical Department until May 16, 2005 (*id*.), (3) a renewed consult for Dr. Zaslau was considered on May 21, 2005 (CMS' Interdisciplinary Progress Notes, Med. Defs.' Ex. 00366, (Document No. 88-9)), and (4) Dr. Holmes, within eight days of receiving the May 9th letter made another consult request for Dr. Zaslau on May 24, 2005 (Consultation Request, Pl.'s Ex. E-22 (Document No. 107-2) at 36.) On these facts, drawing all reasonable inferences in favor of Plaintiff, this Court cannot conclude that Plaintiff was scheduled for surgery on May 13, 2005, as he asserts. A scheduled surgery for May 13, 2005, is unreasonable given the notations in his medical records and that Dr. Zaslau required further tests to determine the location and size of Plaintiff's stricture.

Finally, Plaintiff challenges the reason his September, 2005, surgery with Dr. Zaslau was cancelled and attributes to Dr. Holmes "some of the delay" up to December, 2005, when the surgery was rescheduled. There is no dispute that after Plaintiff's August 12, 2005, procedures, Dr. Zaslau indicated that an open urethroplasty was needed; that four days later, on August 16, 2005, Dr. Holmes made a consultation request for this procedure (Consultation Request, Pl.'s Ex. E-23 (Document No. 107-2) at 37); CMS officials approving the procedure requested additional information prior to approving the appointment (CMS OP Review Communication Form, Pl.'s Ex.

E-24, (Document No. 107-2 at 38), an appointment with Dr. Zaslau was subsequently scheduled for September 22, 2005; Plaintiff was admitted to the MOCC infirmary for treatment of his back pain on September 16, 2005 (CMS' Interdisciplinary Progress Notes, Med. Defs.' Ex. 00372, (Document No. 88-9)), and Plaintiff was discharged on September 20, 2005 ( CMS' Interdisciplinary Progress Notes, Med. Defs.' Ex. 00373, (Document No. 88-9.))   Plaintiff's factual dispute is that his September 22, 2005, surgery was cancelled not because he was suffering from severe back pain and was in the infirmary, but because Dr. Holmes did not tell the nursing staff to put a hold on his aspirin based pain medications for a period of one week before his surgery.  Plaintiff's medical records do not clearly indicate the reason why this appointment was cancelled.  However, there is no dispute that during his stay in the infirmary he was provided pain medications and antibiotics. Drawing all inferences in favor of  the non-moving party and accepting Plaintiff's assertion that his surgery was cancelled because a doctor failed to notate his chart with respect to the receipt of NSAIDS and aspirin products, the Court finds that the appointment was cancelled, at best, due to mere negligence. As has been mentioned previously, it is well-established that negligence is not a basis for a Section 1983 action.  *Daniels v. Williams*, 474 U.S. 327, 329-336 (1986).   It is undisputed that Dr. Holmes left his employment position at MOCC seven days later on September 29, 2005.  On these facts, there is no evidence that Dr. Holmes is responsible for any attempts, or the lack thereof, to reschedule Plaintiff's appointment thereafter.

In sum, Plaintiff has presented to this Court various factual disputes.  However, upon a review of his medical records and considering the totality of his treatment, these facts are not material to his claim of deliberate indifference or in violation of the Eighth Amendment, as they do not present any genuine issues of material fact that Dr. Holmes acted with deliberate indifference.

Moreover, this Court finds Plaintiff's claims fatally flawed in that there is no evidence in the record that Dr. Zaslau opined on any purported delay in performing any of the surgical procedures which made the medical treatment of Plaintiff's condition more complex, difficult or medically emergent than it would have been otherwise.   Additionally, Plaintiff suffered no complications during or after either the August, 2005, or March, 2006, surgical procedures.  Deliberate indifference may be demonstrated by actual intent or reckless disregard. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).  An Eighth Amendment violation occurs where the treatment is "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." (*Id.* at 851-52.)  Moreover, deliberate indifference is an "extremely high standard to meet" and negligent conduct by prison officials do not rise to the level of a constitutional violation.  *Daniels v. Williams*, 474 U.S. 327, 329-336 (1986).  Drawing all reasonable inferences in favor of Plaintiff, however, the record demonstrates during the time in which Plaintiff was awaiting a consult on his medical condition and any surgical procedures, the Medical Defendants did not abandon his medical care or act with any actual intent or reckless disregard.  On these facts there can be no finding that Dr. Williamson or  Dr. Holmes was deliberately indifferent to Plaintiff's medical care.  An objective review of the evidence could result in an inference that Defendants Williamson and Holmes may have acted negligently in the scheduling of doctor appointments or referrals, but even if that inference is made,  such actions do not satisfy the elements of a deliberate indifference claim.  Thus, this Court finds that Plaintiff is not entitled to summary judgment as a matter of law.  Therefore, this Court **ADOPTS** the Magistrate Judge's recommendation that Plaintiff's Motion for Summary Judgment as to Defendants Williamson and Holmes be denied and Defendants Williamson and Holmes' motion for summary judgment be granted.

*(4)     Defendant Westfall and Plaintiff's G-1 Grievance*

Plaintiff objects to the Magistrate Judge's finding that Defendant Westfall did not know of and disregarded an excessive risk to his health or safety.  Specifically, Plaintiff asserts that he informed Defendant Westfall of the need for his second surgery.  (Objections at 10.)  He argues that "if she would have looked into the grievance as the Commissioner ordered her to do she surely would have remembered the Plaintiff's need for the second surgery."  (*Id.*)  Plaintiff maintains that Defendant Westfall "is at least partly responsible for the delays and pain and suffering [that he] had to endure" in that she "could . . . not [be] bothered [to answer his August 3, 2005 grievance] so she "had nurse Hobbs answer it."  (*Id.*)  Plaintiff asserts that Defendant Westfall's failure to answer his grievance "is in [his] opinion her way of choosing to ignore [him] and the risk to his health."  (*Id.* at 11.)

Upon a *de novo* review of the record, this Court **OVERRULES** Plaintiff's objection. Plaintiff asserts that Defendant Westfall should have "remembered" that he needed an additional surgery upon consideration of his G-1 grievance.  This Court has reviewed Plaintiff's August 3, 2005, G-1 grievance and finds that it could not have served as notice to Defendant Westfall of his need for a second surgery, obviously, because he did not receive his <u>first</u> surgical procedure until August 12, 2005.  It is undisputed that at the time Plaintiff filed his August 3, 2005, grievance, Plaintiff had an appointment with Dr. Zaslau scheduled for August 12, 2005, although he was unaware of the appointment for security purposes.  It was not until after this August 12th procedure that Dr. Zaslau determined that Plaintiff had a "severe proximal penile urethral stricture"and that an open urethroplasty was needed. (Pl's. Ex. E-1 (Document No. 107-2) at 1, 3.)  Further, Plaintiff's G-1 grievance was unquestionably directed toward the receipt of pain medication, or the lack

-33-

thereof, rather than an inquiry with respect to any alleged delay in a surgery.[12] Likewise, Plaintiff's

August 8, 2005, G-2 grievance to Defendant McBride would not have advised Defendant Westfall

of Plaintiff's need for a second surgical procedure.  As with his first grievance, Plaintiff did not raise

any complaint with respect to any alleged delay in medical treatment for his urinary tract condition,

although, he did make such an assertion with respect to the treatment of his back injury.  (Pl's. Ex.

A-3 (Document No. 107-1) at 8.)  Plaintiff merely indicated that his replacement medication was

inadequate.  In a response dated August 16, 2005, Defendant McBride responded to Plaintiff's G-2

grievance by acknowledging that his G-1 grievance was unanswered, but noted that Plaintiff was

called to the medical department on August 8, 2005, during which time he was provided an

explanation with respect to the discontinuance of his pain medications.  Therefore, Defendant

Westfall could not have been alerted to Plaintiff's need for a second surgery upon review of his G-1

and G-2 grievance forms.

It is undisputed that Plaintiff wrote Defendant Rubenstein a letter on August 25, 2005,

discussing, among other things, the "trouble [he had] getting a surgery [he] was told [he] needed

almost 2 years ago." (Pl.'s Ex. A-5 (Document No. 107-1) at 10-11.) Plaintiff advised that "[d]uring

the time period from when [he] filed the G-2 until [he] received the answer [from Defendant

---

[12]   In his grievance, Plaintiff stated that he suffered from three medical ailments–kidney pain, nerve damage which resulted in constant headaches and back pain–which were causing him pain. He grieved that his pain medications were discontinued without explanation.  With respect to his kidney pain, Plaintiff asserted the following:

> The Indocin was prescribed for kidney pain due to a restriction in my urinary tract. I also have a restriction below my bladder, both of which are supposed to be removed by Dr. Zaslou [sic] in Morgantown.  Until they are removed I will continue to have this kidney pain, it took 2 yrs for CMS to get me to Morgantown after Dr. Edgerton told me he would refer me, still no surgery and now no pain medication. . . . At this time I would like an explanation to as why my pain medication has stopped and why I haven't seen [a doctor] for my back as Dr. Amosie told me I would. . . . I would like to see him to put this back right and I would like my pain meds renewed, the Indocin until the surgery is taken care of and the kidney pain stops[.]

(Pl.'s Ex. A-2  (Document No. 107-1) at 5-6.)

McBride he] did make it out [to surgery], but because of the delay by CMS the simple 45 minute procedure could not be done and [that he was] . . .facing a major surgery." (*Id*.) In response to Plaintiff's letter, on September 21, 2005, Defendant Rubenstein directed Defendant Westfall to review Plaintiff's G-1 and G-2 forms and to respond to his inquiries within the next five business days. (Pl.'s Ex. A-6 (Document No. 107-1) at 12.) It is also undisputed that Defendant Westfall did not respond to the August 3, 2005, grievance as directed. However, even if she had reviewed his grievances and medical records pursuant to Defendant Rubenstein's September 21, 2005, directive, she would have learned that Plaintiff had an appointment scheduled with Dr. Zaslau on September 22, 2005; that Plaintiff had been in the MOCC infirmary for several days where he received treatment and pain medication for his back injury; that he was discharged from the infirmary where on September 20, 2005, and that his September 22, 2005, procedure was cancelled.[13] Further, she would have learned that although Dr. Zaslau indicated after the August 12th procedure that an additional surgery was necessary, the doctor did not provide a time frame for this surgery. Instead, Dr. Zaslau in his Operation Summary indicated that Plaintiff would be notified as to the date and time for his upcoming surgery. (Pl.'s Ex. E-1 (Document No. 107-2) at 3.) Thus, there is no indication that Defendant Westfall would have known that the second surgery was medically time sensitive.[14] There is no evidence, despite Plaintiff's assertion otherwise, that Dr. Zaslau required that he return in two to three weeks. Plaintiff's appointment with Dr. Zaslau was not rescheduled

---

[13]   Although Plaintiff disputes the Medical Defendants' explanation as to why his September 22, 2005, appointment was cancelled, the reason is not material to the claim with respect to Defendant Westfall as there is no evidence that Defendant Westfall was involved in the scheduling or canceling of his September, 2005, surgery.

[14]   This Court makes no finding herein that Plaintiff's urethroplasty was indeed medically time sensitive. This Court notes that the procedure was scheduled in March, 2006, approximately two months after Plaintiff's next appointment with Dr. Zaslau in January, 2006.

until December, 2005, for an appointment in January, 2006.[15]  This Court finds that there is no evidence that Plaintiff advised Defendant Westfall of the need for, or the delay in, receiving this second surgery.  Plaintiff concedes as much, in his objections, when he stated "[w]hat sense was there to keep writing her when she chose to consciencely [sic] ignore the g-1 for 2 months." (Objections at 11.)  Therefore, Plaintiff is now unable to assert that Defendant Westfall "knew of and disregarded his health or safety" when he failed to seek her assistance or initiate a grievance with respect to the delay in obtaining his second surgery.

Moreover, there is no evidence that Defendant Westfall's failure to respond to Plaintiff's grievance delayed any treatment by Dr. Zaslau.  This is especially true in this case where Plaintiff was not prejudiced by Defendant Westfall's failure to respond to his August 3, 2005, administrative grievance since (1) he utilized the second level of the grievance process by seeking resolution before the Warden when he failed to receive a response from Defendant Westfall and (2) his grievance was ultimately answered, albeit by Mr. Hobbs, Director of Nursing.  Mr. Hobbs advised Plaintiff that his initial grievance was not responded to because Defendant Westfall was out of town.  There is no explanation in the record with respect to why Mr. Hobbs responded to Plaintiff's grievance as opposed to Defendant Westfall as Defendant Rubenstein directed.  However, this Court finds that the mere disagreement with respect to which individual responded to his grievance, without more, is not sufficient to establish a deliberate indifference claim.  Further, as discussed above, Plaintiff has not shown that Defendant Westfall knew of and disregarded an excessive risk to his health or safety because he did not assert any delay in obtaining his second surgery in either of his grievance forms.  Plaintiff has failed to make a showing sufficient to establish the existence of an essential

---

[15]  Plaintiff does not object to the Magistrate Judge's analysis that this delay in scheduling "appears to be the result of possible negligence on the part of the medical department."  (PF&R at 29.)

element of his claim, therefore "there can  be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322-23. Thus, the Court finds that Plaintiff's motion for summary judgment as to Defendant Westfall is denied and Defendant Westfall's motion for summary judgment is granted.

### (5)    *Defendant McBride*[16]

Plaintiff alleges that Defendant McBride violated his constitutional rights by failing to investigate his claim that CMS was delaying his surgery.  The Magistrate Judge reviewed Defendant McBride's response to Plaintiff's grievance.  In granting summary judgment in favor of Defendant McBride, Magistrate VanDervort found that Defendant McBride: did not knowingly disregard Plaintiff's need for treatment by Dr. Zaslau when he denied Plaintiff's G-2 on August 16, 2005; "denied Plaintiff's grievance based upon the medical opinions of the medical staff[,]" and did not act  "wantonly, obdurately or with deliberate indifference to the pervasive risk of harm."  (PF&R at 35-36.)  In support of his findings Magistrate Judge VanDervort found that there is no evidence that Defendant McBride was personally involved in the denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment or tacitly authorized the prison physicians' conduct.  (*Id*. at 36.) The Magistrate Judge found that "[t]he record revealed that Defendant McBride was not aware of Plaintiff's complaint of an alleged delay in medical treatment until August 10, 2005 [upon receipt

---

[16]    Defendants McBride and Rubenstein filed a joint motion to dismiss asserting the same arguments.  The Magistrate Judge has properly recommended that summary judgment should be granted in favor of Defendant Rubenstein, a recommendation  to which Plaintiff did not object.  The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Therefore, all references to the State Defendant's motion for summary judgment will only focus on Defendant McBride.

of Plaintiff's G-2 grievance form.]" (*Id.*)  Magistrate Judge VanDervort observed that outside of the

G-2 grievance, "Plaintiff . . . has shown no other personal involvement by Defendant[] McBride[.]"

(*Id.* at 35.)[17]

Plaintiff objects to the Magistrate Judge's finding that he failed to show Defendant McBride

had personal involvement outside of consideration of his G-2 grievance form.  Plaintiff argues that

Magistrate Judge VanDervort did not consider the five affidavits he provided to the Court which

document that he had at least three conversations with Defendant McBride about his medical

problem and surgeries prior to the submission of his G-2 grievance or the November 27, 2005, letter

he sent to Defendant McBride. (Objections at 11.)   To the extent that Plaintiff asserts that there is

some evidence in the record indicating that Defendant McBride had knowledge of Plaintiff's

medical condition prior to August 10, 2005, which was not considered by the Magistrate Judge, this

Court **SUSTAINS** Plaintiff's objection and will consider the issue *de novo*.

Defendant McBride moves for summary judgment on the grounds that Plaintiff failed to

prove that he was aware the Plaintiff suffered from a condition that presented a serious medical need

to which he was deliberately indifferent, that he is not a "person" for purposes of the application of

42 U.S.C. § 1983, and that Plaintiff cannot establish any element of a claim for supervisory liability.

(James Rubenstein and Thomas McBride's Motion for Summary Judgment ("State Defs.' Mot.")

(Document No. 85) at 1.)   For the purposes of his motion for summary judgment, Defendant

McBride does not contest that Plaintiff suffered from a "sufficiently serious" medical need.  (James

Rubenstein and Thomas McBride's Memorandum in Support of their Motion for Summary

---

[17]   Ultimately, the Magistrate Judge also concluded that dismissal of a non-medical defendant is appropriate where that defendant's sole involvement is the denial of an administrative remedy request and that Plaintiff improperly raised his claim against the State Defendants under the doctrine of *respondeat superior* and failed to establish supervisory liability.

Judgment (Document No. 86), at 10.)  However, he argues, *inter alia*, that (1) there is no evidence that he was deliberately indifferent to Plaintiff's medical needs or interfered in his treatment; (2) that Plaintiff did not advise him of his complaints about his medical care or any alleged delay in care until he filed his G-2 grievance on August 9, 2005, two years after he claimed that Dr. Edgerton referred him to Dr. Zaslau for treatment; (3) that he responded to Plaintiff's grievance, but had no opportunity to do anything with regard to Plaintiff's treatment because Plaintiff was seen in medical shortly after filing his G-2 grievance form; (4) there is no indication that he was aware of grossly inadequate care and tacitly allowed the same; (5) assuming that the alleged delay caused injury to Plaintiff, there is no evidence that the surgery Plaintiff received six and one-half months after he responded to Plaintiff's G-2 grievance made any difference in Plaintiff's medical treatment and that assuming there was a delay any such allegation is an allegation of medical malpractice or a disagreement with medical personnel which would not implicate his liability.

Plaintiff asserts in his affidavit that he (1) "discussed the medical problems [he] was experiencing" with Defendant McBride in "late 2004" when Defendant McBride visited the Facilities Maintenance Technologies class; (2) "had a conversation with [Defendant McBride in the summer of 2005] concerning the restrictions in [his] urinary tract and the delay [he] was experiencing getting the surgery Dr. Edgerton said he needed the fall before";[18] (3) "had a conversation with [Defendant McBride]" during the second week of November, 2005 in front of Oak Hall housing unit "concerning the first surgery in August, 2005, the fact that the Doctor placed a suprapubic catheter in [his] abdomen, the infections it was causing and the delay in the second surgery that [he] was told by Dr. Zaslau would be scheduled in about 2 weeks."  (Affidavit of

---

[18]   The Court notes that this assertion supports its finding above that surgical options were not presented to Plaintiff until July, 2004.

Michael James Motto, Pl.'s  Ex. D-1 (Document No. 107-1) at 33-34.)[19]  Plaintiff, in his objections,

argues that "every time [Defendant McBride] would see the Plaintiff on the compound[,] the Warden

would ask the Plaintiff how he was doing but would do nothing about any complaints he would

have, medical or otherwise." (Objections at 11.)

To state a claim for deliberate indifference, Plaintiff must make a showing with respect to

two elements: (1) that he has a serious medical need and (2) Defendant McBride acted with

deliberate indifference to that serious medical need.  (*See Wilson v. Seiter*, 501 U.S. 294, 297 (1991)

(Prison officials violate the Eighth Amendment's prohibition against cruel and unusual punishment

when they "demonstrate deliberate indifference to a prisoner's serious medical needs, constituting

unnecessary and wanton infliction of pain.")  To establish deliberate indifference, the prison official

"must both be aware of the facts from which the inference could be drawn that a substantial risk of

serious harm exists and he must also draw the inference."  *Brown v. Harris*, 240 F.3d 383, 389 (4th

Cir. 2001) (quoting *Farmer*, 511 U.S. at 837.)  "But an official's failure to alleviate a significant risk

that he should have perceived but did not . . . cannot under our cases be condemned as the infliction

of punishment."  (*Farmer*, 511 U.S. at 838.)   Moreover, "[w]hether a prison official had the

requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison

official knew of a substantial risk from the very fact that the risk was obvious."  (*Id.* at 842.)

However, "prison officials who lacked knowledge of a risk cannot be said to have inflicted

punishment" and they may show "that they did not know of the underlying facts indicating a

---

[19]   Plaintiff submitted the affidavits of (1) Neil Williams, who witnessed the conversation in the summer of 2005; (2) Roger Simmons, who witnessed the conversation at "sometime [during] the [second] week of November, 2005; (3) Michael McKinney, who was witnessed the conversation in the summer of 2005 and in November of 2005, and (4) Robert D. Fisher, who witnessed the conversation with the Warden in late 2004.  (Pl.'s Ex.D-2 - D-5).

sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." (*Id*. at 844.)

Defendant McBride, in his reply to his motion for summary judgment, assumes "for argument's sake" that Plaintiff had these conversations with him, but he submits that such conversations are insufficient to begin an administrative grievance procedure for an investigation into the quality of his medical care. (James Rubenstein and Thomas McBride's Reply to Michael James Motto's Response to These Defendants' Motion for Summary Judgment, ("State Defs.' Reply") (Document No. 110) at 2.) The Court rejects such an assertion since the pertinent issue is not whether Plaintiff properly initiated the administrative remedy process, but rather whether Defendant McBride knew about Plaintiff's medical care and perceived a substantial risk to his health. The Court has reviewed the exhibits and affidavits attached to the parties' motions. Drawing all permissible inferences in the light most favorable to the Plaintiff, the Court finds that there is no genuine issue of a material fact as to Defendant McBride which would preclude summary judgment in his favor.

Drawing all reasonable inferences from the record, in consideration of Plaintiff's affidavits, this Court finds that Defendant McBride did have knowledge of some facts relating to Plaintiff's medical care but did not take any action as a result of that knowledge. However, even if we credit Plaintiff with the benefit of this showing, Plaintiff has not demonstrated that Defendant McBride drew any inference that a substantial risk of serious harm existed. (*See Brown*, 240 F.3d at 389.) Moreover, Plaintiff cannot demonstrate that Defendant McBride's actions or inactions caused any delay in his medical treatment or deliberately placed his health at risk. This Court finds that after

-41-

each conversation, Plaintiff was seen in a reasonable amount of time by the medical professional he desired to see, Dr. Zaslau, for treatment of the condition about which he complained.  Plaintiff states that he had a conversation with Defendant McBride in late 2004.  The record reveals that in December, 2004, Plaintiff was scheduled for the first available appointment with Dr. Zaslau on March 21, 2005.  It is not material as to Defendant McBride that Plaintiff's appointment was rescheduled for a week earlier and Plaintiff refused to go to that appointment because he was ill.  Plaintiff's appointment was ultimately rescheduled for May 13, 2005, although he was seen by Dr. Zaslau on May 2, 2005.  After an examination of Plaintiff, Dr. Zaslau concluded that Plaintiff had a urethral stricture, but noted that its location and length were unknown. (Pl.'s Ex. E-21 (Document No. 107-2) at 35.)  Plaintiff states that he discussed his medical problems with Defendant McBride again during the summer of 2005.  The record reveals that Plaintiff was treated by Dr. Zaslau on August 12, 2005, during the summer of 2005.  While Defendant McBride was aware that Plaintiff's condition required the use of a suprapubic catheter, there is no evidence that Defendant McBride had knowledge that his actions or inactions increased any risks to Plaintiff's health or exposed Plaintiff to other risks.  The totality of Plaintiff's medical records with respect to his urinary condition does not reveal that Defendant McBride's actions altered, impacted or frustrated Plaintiff's health.  There is no evidence in the record that Plaintiff's condition deteriorated or that his surgery was unduly difficult as a result of any alleged delay. Thus, this Court finds that Defendant McBride's knowledge was immaterial to Plaintiff's treatment.

Moreover, this Court finds that Plaintiff did not assert his concerns about any alleged delay in his medical treatment until he submitted his G-3 grievance (August 25, 2005 letter) to Defendant Rubenstein. As discussed above, in his G-1 grievance he asserted a concern and inquiry with respect

to the discontinuation of his pain medication.  Although, he mentioned that he had been waiting two years for a surgery, he did not request any action or an investigation into any alleged delay.  Instead, he desired to know why his pain medications were discontinued and when he would see a doctor about his back pain.  When he submitted his G-2 grievance to Defendant McBride,  the Court finds it telling that despite having previous discussions about his medical problems with Defendant McBride, he did not mention (1) any of these previous conversations, (2) the warden's inaction based on those conversations, or (3) that his condition remained untreated.  Instead, he had a specific inquiry about his pain medication.  Before Defendant McBride could address his grievance, Plaintiff had been given an explanation about why his pain medications were temporarily discontinued and had seen Dr. Zaslau for a surgical procedure.  Defendant McBride, in his response, relied on the medical opinions of medical personnel and the Plaintiff's intervening surgery before he denied the grievance.  On these facts, Plaintiff cannot assert a claim of deliberate indifference.

On November 27, 2005, Plaintiff wrote Defendant McBride a letter wherein he referenced a conversation they had earlier that month about the Plaintiff having a urinary tract infection and the scheduling of his second surgery. (Pl.'s Ex. B-5 (Document No. 107-1) at 19.)  He affirmatively stated that he "fe[lt] Dr. Plansk is doing a good job trying to get this surgery scheduled," but asked Defendant McBride for his assistance. There is no evidence in the record that Defendant McBride acted or failed to act on this request.  However, soon thereafter, on December 28, 2005, the administrative assistant for the medical department scheduled an appointment with Dr. Zaslau for January 30, 2006.  (Affidavit of Mary Westfall, Ex. A (Document No. 88-1), ¶ 5.)  Dr. Zaslau again examined Plaintiff and an appointment for his second surgery was scheduled for March, 2006. Plaintiff has not shown that there was any detrimental effect to his health as a result of any of

-43-

Defendant McBride's inactions.  There is no evidence that Defendant McBride personally denied, interfered with or tacitly authorized Plaintiff's medical treatment.  Therefore, while Plaintiff has shown that Defendant McBride was aware of facts of his medical condition before August, 2005, when he submitted his G-2 grievance, there is no evidence that such awareness could have supported any inference of a substantial risk of serious harm to Plaintiff's health and that Defendant McBride drew an inference. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment." (*Farmer*, 511 U.S. at 838.)

## *V.   CONCLUSION*

In sum, based upon a review of Plaintiff's medical records, there is no evidence that these Defendants acted with deliberate indifference in treating Plaintiff's medical condition.  The Honorable R. Clarke VanDervort, United States Magistrate Judge, recommends that this Court grant Defendants' Motions for Summary Judgment, deny Plaintiff's Motion for Summary Judgment, dismiss Plaintiff's Complaint and remove the matter from the Court's docket.  Consistent with the findings herein, this Court does hereby **ORDER** that Defendants' Motions for Summary Judgment [Document No. 85 and Document No. 88] are **GRANTED** and Plaintiff's Motion for Summary Judgment  [Document No. 149] is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.          ENTER:       November 16, 2010

_____
IRENE C. BERGER, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

-44-